**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

STATE OF ILLINOIS et al.,

      Defendants.

No. 3:25-cv-02220-DWD

Honorable David W. Dugan

## <u>DEFENDANTS' MOTION TO DISMISS</u>

KWAME RAOUL
Illinois Attorney General

Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

I.      The federal government lacks Article III standing to challenge the Bivens Act
        because there are no Illinois officials who enforce it. .......................................... 5

II.     The federal government's Court Act challenge should be dismissed for lack of
        subject-matter jurisdiction or, alternatively, for failure to state a claim. ..........11

        A.      The federal government is not adverse to the Illinois judges who may issue
                "judicial orders to protect the privilege from arrest." ...........................................11

        B.      The Court Act does not interfere with or control the federal government's
                operations because federal law does not authorize courthouse arrests. ............... 14

CONCLUSION.................................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015)........................................................................................ 10

*Babbitt v. United Farm Workers National Union*,
    442 U.S. 289 (1979).......................................................................................... 6

*Blair v. Equifax Check Services, Inc.*,
    181 F.3d 832 (7th Cir. 1999) ............................................................................ 1

*California v. Texas*,
    593 U.S. 659 (2021).......................................................................................... 7

*Campos-Chaves v. Garland*,
    602 U.S. 447 (2024)........................................................................................ 18

*Chicago Headline Club v. Noem*,
    No. 25 C 12173, 2025 WL 3240782 (N.D. Ill. Nov. 20, 2025) ................................... 1, 3

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992)........................................................................................ 17

*Cleeton v. SIU Healthcare, Inc.*,
    220 N.E.3d 1050, 2023 IL 128651......................................................................11

*Crooks v. Maynard*,
    913 F.2d 699 (9th Cir. 1990) .......................................................................... 13

*Dahnke v. People*,
    48 N.E. 137, 168 Ill. 102 (1897) ...................................................................... 13

*Democratic National Committee v. Bostelmann*,
    977 F.3d 639 (2020) ....................................................................................... 12

*Diaz v. Cantu*,
    123 F.4th 736 (5th Cir. 2024).......................................................................... 13

*Disability Rights South Carolina v. McMaster*,
    24 F.4th 893 (4th Cir. 2022)............................................................................. 8

*Doe v. Holcomb*,
    883 F.3d 971 (7th Cir. 2018)............................................................................ 8

*Doe v. ICE,*
    490 F. Supp. 3d 672 (S.D.N.Y. 2020) ........................................................ 15, 19

*Ewing v. Carrier,*
    35 F.4th 592 (7th Cir. 2022) .................................................................... 1

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................................ 10

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ............................................................................... 5, 6

*Frazier v. Prince George's County,*
    140 F.4th 556 (4th Cir. 2025) ................................................................ 10, 13

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ............................................................................... 12

*Green Plains Trade Group, LLC v. Archer Daniels Midland Co.,*
    90 F.4th 919 (7th Cir. 2024) ................................................................... 11

*Greer v. Young,*
    11 N.E. 167, 120 Ill. 184 (1887) ........................................................... 13, 16

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ............................................................................... 1

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................................................... 7

*Homola v. McNamara,*
    59 F.3d 647 (7th Cir. 1995) ................................................................... 13

*Illinois v. Trump,*
    155 F.4th 929 (7th Cir. 2025) ................................................................ 2

*In re Terrell,*
    39 F.4th 888 (7th Cir. 2022) ................................................................. 12

*In re the Justices of the Supreme Court of Puerto Rico,*
    695 F.2d 17 (1st Cir. 1982) ................................................................... 9

*Johnson v. Maryland,*
    254 U.S. 51 (1920) ................................................................................. 19

*Kellogg v. Nichols,*
    149 F.4th 155 (2d Cir. 2025) ................................................................. 10, 13

*Kentucky v. Graham,*
    473 U.S. 159 (1985) .................................................................................. 8

*Lackey v. Stinnie,*
    604 U.S. 192 (2025) ................................................................................ 12

*Lamb v. Schmitt,*
    285 U.S. 222 (1932) ................................................................................ 17

*Lindke v. Tomlinson,*
    31 F.4th 487 (6th Cir. 2022) ................................................................. 10, 13

*Louisiana Public Service Commission v. FCC,*
    476 U.S. 355 (1986) ................................................................................ 15

*Mack v. Resurgent Capital Services, L.P.,*
    70 F.4th 395 (7th Cir. 2023) .................................................................... 5

*Maksimovic v. Tsogalis,*
    687 N.E.2d 21, 177 Ill. 2d 511 (1997) .................................................. 16

*McHenry County v. Raoul,*
    44 F.4th 581 (7th Cir. 2022) ................................................................... 20

*Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ................................................................................ 17

*Montoya v. National Railroad Passenger Corporation,*
    118 F.4th 900 (7th Cir. 2024) ................................................................ 12

*Moreno Gonzalez v. Noem,*
    No. 25 C 13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ................. 2

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ................................................................................... 7

*Neitzke v. Williams,*
    490 U.S. 319 (1989) .................................................................................. 5

*New York v. ICE,*
    431 F. Supp. 3d 377 (S.D.N.Y. 2019) ...................................... 15, 16, 17, 18

*North Carolina v. Ivory*,
  906 F.2d 999 (4th Cir. 1990) ................................................................. 19

*Ortiz v. Foxx*,
  596 F. Supp. 3d 1100 (N.D. Ill. 2022) .................................................... 10

*Papasan v. Allain*,
  478 U.S. 265 (1986) ................................................................................. 5

*Pasquantino v. United States*,
  544 U.S. 349 (2005) ............................................................................... 18

*Pennhurst State School & Hospital v. Halderman*,
  465 U.S. 89 (1984) ................................................................................... 8

*Pulliam v. Allen*,
  466 U.S. 522 (1984) ................................................................................. 9

*Restoration Risk Retention Group, Inc. v. Gutierrez*,
  880 F.3d 339 (7th Cir. 2018) ................................................................. 10

*Reule v. Jackson*,
  114 F.4th 360 (5th Cir. 2024) .......................................................... 10, 13

*Rogers v. Imeri*,
  999 N.E.2d 340, 2013 IL 115860 ........................................................... 12

*Ryan v. ICE*,
  974 F.3d 9 (1st Cir. 2020) ...................................................................... 15

*Stewart v. Ramsay*,
  242 U.S. 128 (1916) .......................................................................... 13, 16

*Support Working Animals, Inc. v. Governor*,
  8 F.4th 1198 (11th Cir. 2021) .................................................................. 8

*Texas v. United States Department of Homeland Security*,
  123 F.4th 186 (5th Cir. 2024) .......................................................... 19, 20

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .............................................................................. 6, 7

*Trump v. Illinois*,
  146 S. Ct. 432 (2025) ............................................................................... 3

*United States ex rel. Drury v. Lewis*,
    200 U.S. 1 (1906) ................................................................................................ 19

*United States v. Illinois*,
    796 F. Supp. 3d 494 (N.D. Ill. 2025) .................................................................... 6

*United States v. New York*,
    No. 25-CV-744, 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025).......... 15, 16, 17, 18, 19, 20

*United States v. Texas*,
    507 U.S. 529 (1993) ............................................................................................ 17

*United States v. Texas*,
    599 U.S. 670 (2023) .............................................................................................. 6

*United States v. Washington*,
    596 U.S. 832 (2022) ...................................................................................... 14, 19

*United States v. West Virginia*,
    295 U.S. 463 (1935) .............................................................................................. 6

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .............................................................................................. 6

*Velazquez-Hernandez v. ICE*,
    500 F. Supp. 3d 1132 (S.D. Cal. 2020) ........................................ 15, 16, 17, 19

*Washington v. United States Department of Homeland Security*,
    614 F. Supp. 3d 863 (W.D. Wash. 2020) ............................................................ 15

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ................................................................... 6, 9, 10, 12

**Constitutional Provisions**

Ill. const. art. V, § 15 ................................................................................................ 8

Ill. const. art. V, § 8 .................................................................................................. 8

**Statutes**

8 U.S.C. § 1226 ....................................................................................................... 18

8 U.S.C. § 1229 ....................................................................................................... 18

8 U.S.C. § 1357 .................................................................................................. 18, 20

8 U.S.C. § 1367 ............................................................................................... 18

5 ILCS 50/1 ................................................................................................... 16

705 ILCS 96/art. 10 ........................................................................................11

705 ILCS 96/10-5 ...................................................................................... 4, 12

705 ILCS 96/10-15 .......................................................................................... 4

705 ILCS 96/10-20 .......................................................................................4, 11

705 ILCS 96/10-25 .......................................................................................4, 11

740 ILCS 16/art. 5 ........................................................................................... 7

740 ILCS 16/5-10 ........................................................................................ 4, 8

740 ILCS 16/5-15 ............................................................................................ 4

**Rules**

Fed. R. Civ. P. 65 ............................................................................................ 8

N.D. Ill. L.R. 40.4 ........................................................................................... 1

**Other Authorities**

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1768) ............................. 15

Andrew Carter et al., "64 Days in Chicago: The Story of Operation Midway Blitz,"
CHICAGO TRIBUNE (Dec. 28, 2025) .................................................................. 2

Illinois Public Act 104-440 ............................................................................. 3

Melody Mercado, "Immigration Advocates Sound Alarm After ICE Arrests at Domestic
Violence Court," BLOCK CLUB CHICAGO (Sept. 4, 2025).................................... 3

## INTRODUCTION

"Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). This litigation illustrates the enduring wisdom of our constitutional design. The federal government seeks to enjoin enforcement of two Illinois laws that ask nothing more from the federal government than that it comply with federal law. But this brazen attempt to evade accountability runs headlong into constitutional limitations on the federal courts' jurisdiction. The federal government's remarkable claims should meet an unremarkable end: all of them should be dismissed.[1]

## BACKGROUND

On a sunny Saturday morning in early September last year, "President Trump posted on social media a photograph of the Chicago skyline on fire and with military helicopters" swooping over Lake Michigan. *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *15 (N.D. Ill. Nov. 20, 2025). The photograph was "titled 'Chipocalypse Now'" and President Trump added a message: "'"I love the smell of deportations in the morning..." Chicago about to find out why it's called the Department of WAR.'" *Id.* Two days later, "the Trump administration announced 'Operation Midway Blitz'—an escalation of the administration's

---

[1] It appears that this action was assigned not by random draw, *see* ECF 4, but rather because the federal government indicated on the civil cover sheet, ECF 1-1, that it is related to *United States v. Illinois*, No. 3:25-cv-01691-DWD, a separate action in which the federal government challenges different Illinois laws (concerning higher education benefits) under a different legal theory (preemption). The two actions do not share any common questions or law or fact; nor do they overlap in any other way that would seem to justify their being decided by the same judge. *E.g.*, *Ewing v. Carrier*, 35 F.4th 592, 594 (7th Cir. 2022) (same claims); *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) (same relief); *see* N.D. Ill. L.R. 40.4(a)(2) & (3) ("same issues of fact or law" or "same transaction or occurrence"). If the two *United States v. Illinois* actions are to be deemed "related" simply because they involve the same parties, then this Court is likely to be saddled with many more of these cases over the next three years.

enforcement of the immigration laws in Illinois. Federal law enforcement officers increased their presence in the Chicagoland area." *Illinois v. Trump*, 155 F.4th 929, 933 (7th Cir. 2025).

Although the Trump administration claimed that Operation Midway Blitz would "target[ ] 'the worst of the worst,'" a *Chicago Tribune* investigation found that "most of" those arrested "were people with brown skin who were at the right place—their landscaping jobs, the hardware store, a Dunkin' Donuts drive-thru—at the wrong time." Andrew Carter et al., "64 Days in Chicago: The Story of Operation Midway Blitz," CHICAGO TRIBUNE (Dec. 28, 2025). Just "1.5% of those detained for immigration-related reasons had been convicted of a violent felony or sex crime." *Id.* And a federal judge found that many of those who were arrested were subsequently held in "deplorable conditions" in a local immigration detention facility without "adequate food," "personal hygiene products," "toilet facilities," or "access to medication"—and on top of all this were "systematic[ally]" deprived of "access to counsel." *Moreno Gonzalez v. Noem*, No. 25 C 13323, 2025 WL 3204602, at *1 (N.D. Ill. Nov. 17, 2025).

Among the other lowlights of the operation: federal immigration agents conducted a "militarized raid" of a high-rise apartment building in the middle of the night. Andrew Carter et al., "64 Days in Chicago: The Story of Operation Midway Blitz," CHICAGO TRIBUNE (Dec. 28, 2025). They killed a man and tried to justify it by exaggerating the threat he allegedly posed. *Id.* They shot a woman five times "and bragged about it afterward in text messages." *Id.* They "stormed a Spanish-immersion preschool" to arrest "a beloved teacher." *Id.* They deployed tear gas "right before a children's Halloween parade." *Id.* And they "detained a Guatemalan family with children aged 3 and 8 as they ate Popsicles on a Sunday afternoon" in a public park. *Id.*

Two aspects of Operation Midway Blitz are particularly relevant to this litigation.

*First*, a federal judge found that federal immigration agents likely committed numerous

and repeated violations of the First Amendment and the Fourth Amendment when confronting protesters and members of the press at a detention facility and on the streets throughout the Chicagoland area. *Chicago Headline*, 2025 WL 3240782, at *75-86. "[A]gents deployed tear gas, pepper balls, rubber bullets, flashbang grenades, and other munitions against and physically assaulted peaceful protesters." *Id.* at *84. One agent "pointed his gun out [of a car] window" at a protester "and said 'bang bang,' followed by something approximating 'you're dead, liberal.'" *Id.* at *81. These confrontations culminated in President Trump's attempt to deploy hundreds of National Guard members from Illinois and Texas to the streets of Chicago, which the Supreme Court found was likely unlawful because, it explained, "the Government has failed to identify a source of authority that would allow the military to execute the laws in Illinois." *Trump v. Illinois*, 146 S. Ct. 432, 434 (2025).

*Second*, federal immigration agents detained people at Chicago-area courthouses who were participating in state court proceedings. In early September, for example, two people were detained while attending hearings at Cook County's domestic violence court. Melody Mercado, "Immigration Advocates Sound Alarm After ICE Arrests at Domestic Violence Court," BLOCK CLUB CHICAGO (Sept. 4, 2025). Advocates for survivors of domestic violence warned that "'these actions will undermine survivors' trust in our legal system to be a resource to them and will discourage survivors from coming forward if they fear immigration will be at their next court hearing and take their loved ones.'" *Id.*

To protect the people of Illinois from enduring further abuses like those that occurred during Operation Midway Blitz, the General Assembly enacted two new statutes that became effective in December 2025. Illinois Public Act 104-440, arts. 5 & 10.

*First*, the Illinois Bivens Act creates "a civil action" available to private parties "against

any person who, while conducting civil immigration enforcement, knowingly engages in conduct that violates the Illinois Constitution or the United States Constitution." 740 ILCS 16/5-10(a). The civil action provides for "monetary, injunctive, and declaratory relief" of the sort "available at common law," as well as punitive damages and attorney's fees. *Id.* 5-15(a) & (b). Qualified immunity may be asserted as a defense. *Id.* 5-10(b).

*Second*, the Court Access, Safety, and Participation Act codifies "the long-standing common law privilege" that "has been established in English and American jurisprudence for centuries" under which "the parties to a suit and their witnesses are protected from arrest in coming to, attending, and returning from court proceedings for the sake of public justice." 705 ILCS 96/10-5(10). The statute provides:

> A person duly and in good faith attending a State court proceeding in which the person is a party, a witness, a potential witness, or a court companion of a party, witness, or potential witness is privileged from civil arrest while going to, remaining at, and returning from the court proceeding, including:
>
> (1)    at the place of the court proceedings;
>
> (2)    within the courthouse building;
>
> (3)    on the premises of the courthouse, including parking facilities serving the courthouse;
>
> (4)    on any sidewalk, parkway, and street surrounding the courthouse and its premises; and
>
> (5)    on any public way within 1,000 feet of the courthouse including a sidewalk, parkway, or street.

*Id.* 10-15(a). Private parties may enforce the privilege through a new civil action, *id.* 10-25(a), and "a court may issue appropriate judicial orders to protect the privilege," *id.* 10-20.

The federal government contends in this litigation that the Bivens Act and the Court Act violate the supremacy clause of the United States constitution. Count One asserts that both

statutes "purport to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine." ECF 1 at 19, ¶ 82. Count Two asserts that the Bivens Act "unlawfully discriminates against the Federal Government." *Id.* at 20, ¶ 89.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal for "lack of subject-matter jurisdiction." Dismissal under Rule 12(b)(1) is appropriate when the plaintiff fails to establish Article III standing. *E.g.*, *Mack v. Resurgent Capital Services, L.P.*, 70 F.4th 395, 402-03 (7th Cir. 2023). Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." "Although for the purposes of [a] motion to dismiss [the Court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). When "a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate." *Neitzke v. Williams*, 490 U.S. 319, 320 (1989).

## ARGUMENT

### I.    The federal government lacks Article III standing to challenge the Bivens Act because there are no Illinois officials who enforce it.

The federal government fails to establish Article III standing to challenge the Bivens Act, so those claims should be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction. "The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, as [the Supreme] Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024).

5

"The second and third standing requirements—causation and redressability—are often flip sides of the same coin. If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 380-81 (cleaned up).

No one has yet to bring a claim under the Bivens Act (or otherwise enforce the statute), which means the federal government is asserting a "pre-enforcement challenge." Article III permits a pre-enforcement challenge in narrow circumstances: if "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). But the Supreme Court "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021).

Article III's standing requirements are "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated"; they are, to the contrary, an indispensable "part of the basic charter promulgated by the Framers of the Constitution." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 (1982). So a plaintiff must always comply with Article III's standing requirements, even when it is not "efficient or convenient" to do so, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021), and even if the upshot is "that no one would have standing to challenge" the statute or conduct at issue, *Alliance*, 602 U.S. at 396. Unsurprisingly, then, the Supreme "Court has applied" Article III's standing requirements "to all manner of important disputes," *United States v. Texas*, 599 U.S. 670, 675 (2023), even to disputes, like this one, brought by the federal government against a state, *e.g.*, *United States v. West Virginia*, 295 U.S. 463, 470-71 (1935); *see United States v. Illinois*, 796 F. Supp. 3d 494, 508-12 (N.D. Ill. 2025).

6

Here, the federal government insists it "is harmed by the" Bivens Act "because the mere threat of a suit, its proceedings, and eventual liability can chill the zealous enforcement of federal law." ECF 1 at 13, ¶ 54. But, as explained, injury alone does not establish standing; the Court may consider the federal government's challenge to the Bivens Act only if "necessary to redress or prevent" the injury. *Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (cleaned up). And "it is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Id.* at 57 (cleaned up).

To see why the federal government fails to establish Article III standing, consider the three defendants whom it has sued: the State of Illinois, its Governor, and its Attorney General. Article III "standing is not dispensed in gross," *TransUnion*, 594 U.S. at 431, which means that the federal government "'must demonstrate standing for each claim that [it] press[es]' against each defendant," *Murthy*, 603 U.S. at 61. But enjoining any of these defendants' enforcement of the Bivens Act will not relieve the federal government of its asserted injury.

Start with the Governor and Attorney General. The plain language of the Bivens Act does not charge either of them with enforcing the statute. 740 ILCS 16/art. 5. The Bivens Act simply creates a cause of action that is enforced solely by private parties who choose to pursue claims under its authority. *Id.* Because the Governor and Attorney General do not enforce the Bivens Act, the federal government lacks Article III standing to pursue claims against them. *E.g.*, *California v. Texas*, 593 U.S. 659, 670 (2021) ("our cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*"); *see Haaland v. Brackeen*, 599 U.S. 255, 292-93 (2023) (no standing to sue federal officials because "'[t]here is no federal official who administers [the challenged law] or carries out its mandates'").

To be sure, the Governor has "the supreme executive power" and is "responsible for the

7

faithful execution of the laws." Ill. const. art. V, § 8; *see* ECF 1 at 4-5, ¶ 19. But the Seventh

Circuit is clear: "'The mere fact that a governor is under a general duty to enforce state laws does

not make him a proper defendant in every action attacking the constitutionality of a state

statute.'" *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018); *see, e.g.*, *Disability Rights South*

*Carolina v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (same when governor "signed the

appropriations act containing the" challenged law). Likewise, it is no help to the federal

government that the Attorney General is "the legal officer of the State." Ill. const. art. V, § 15;

*see* ECF 1 at 5, ¶ 20. "An attorney general cannot be sued simply because of his duty to support

the constitutionality of a challenged state statute." *Doe*, 883 F.3d at 976; *see Support Working*

*Animals, Inc. v. Governor*, 8 F.4th 1198, 1203 (11th Cir. 2021) (plaintiffs' injuries not caused by

attorney general "who had neither enforced nor threatened to enforce" challenged law).

 What about the State of Illinois? Assume that the federal government could establish

Article III standing by identifying *any* Illinois official who enforces the Bivens Act. After all, "an

American State can act only through its officials." *Pennhurst State School & Hospital v.*

*Halderman*, 465 U.S. 89, 114 n.25 (1984); *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)

(a suit against a state official is a suit against the state). So, if the Court were to enjoin the State

of Illinois from enforcing the Bivens Act, likely that would have the effect of enjoining all

Illinois officials from enforcing the Bivens Act. *See* Fed. R. Civ. P. 65(d)(2)(B) (injunctions bind

"parties' officers, agents, servants, employees, and attorneys").

 The problem is that there aren't any Illinois officials who enforce the Bivens Act. The

text of the statute does not provide that it is enforceable by any Illinois official. Again, it simply

creates a cause of action available to private parties who have been injured by "conduct that

violates the Illinois Constitution or the United States Constitution." 740 ILCS 16/5-10(a).

The only Illinois officials who will have anything to do with the Bivens Act are the judges tasked with adjudicating the claims that private parties may choose to bring under its authority. But these judges won't help the federal government to establish Article III standing either. "As [the Supreme] Court has explained, 'no case or controversy' exists 'between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute.'" *Whole Woman's Health*, 595 U.S. at 40 (quoting *Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984)). "Judges sit as arbiters without a personal or institutional stake on either side of the constitutional controversy." *In re the Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17, 21 (1st Cir. 1982). They "resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions." *Whole Woman's Health*, 595 U.S. at 40. They do not "wage battle as contestants in the parties' litigation." *Id.*

This case is on all fours with *Whole Woman's Health*. Recall the issue there: Texas enacted a statute banning most abortions. 595 U.S. at 35. But the statute did "not allow state officials to bring criminal prosecutions or civil enforcement actions"; instead, it "direct[ed] enforcement through private civil actions." *Id.* at 35-36 (cleaned up). Nevertheless, abortion providers sued a Texas judge (along with other officials) seeking pre-enforcement review of the statute's constitutionality. *Id.* at 36-37. The Supreme Court rejected this approach for lack of Article III standing. *Id.* at 39-40. Federal courts may "resolve only 'actual controversies arising between adverse litigants,'" it explained. *Id.* at 39. And while private parties who file civil actions under Texas's statute would be sufficiently "adverse" to the abortion providers for Article III standing, state judges who adjudicate those civil actions were not. *Id.* at 39-40.

Every federal appellate court to consider the question agrees: under *Whole Woman's Health*, a person who thinks a law is unconstitutional lacks Article III standing to sue judges who

adjudicate claims under the statute. *E.g.*, *Kellogg v. Nichols*, 149 F.4th 155, 161-63 (2d Cir. 2025); *Frazier v. Prince George's County*, 140 F.4th 556, 561-66 (4th Cir. 2025); *Reule v. Jackson*, 114 F.4th 360, 365-66 (5th Cir. 2024); *Lindke v. Tomlinson*, 31 F.4th 487, 490-95 (6th Cir. 2022); *see Ortiz v. Foxx*, 596 F. Supp. 3d 1100, 1107-10 (N.D. Ill. 2022). And this result should come as no surprise; after all, "an injunction against a state court would be a violation of the whole scheme of our government." *Ex parte Young*, 209 U.S. 123, 180 (1908).

Because there are no Illinois officials who enforce the Bivens Act, the federal government lacks Article III standing to pursue this pre-enforcement challenge. But all is not lost: "paths" remain available to the federal government "to vindicate the supremacy of federal law in this area." *Whole Woman's Health*, 595 U.S. at 48. "[M]any federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one." *Id.* at 49-50. So, when a private party brings a claim under the Bivens Act, the federal government may renew its arguments about intergovernmental immunity in that proceeding. And while the federal government plainly would prefer not to wait, "[t]he truth is" that "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Id.* at 49. That is the unavoidable consequence of Article III's jurisdictional restrictions—and the "one thing" that courts "may never do is disregard [those] traditional limits." *Id.* at 51. The federal government's claims concerning the Bivens Act must therefore be dismissed under Rule 12(b)(1).[2]

---

[2] For the same reasons, the federal government also lacks a cause of action. To be sure, "federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326 (2015). But a "district court's authority in this respect is based not on some implied right of action read into the Supremacy Clause, but on [a plaintiff's] 'ability to sue to enjoin unconstitutional actions by state and federal officers.'" *Restoration Risk Retention Group, Inc. v. Gutierrez*, 880 F.3d 339, 346 (7th Cir. 2018); *see Armstrong*, 575 U.S. at 325 (supremacy clause itself "certainly does not create a cause of action"). The problem, again, is that there are no Illinois officials who enforce the Bivens Act.

**II.     The federal government's Court Act challenge should be dismissed for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim.**

The federal government's claim concerning the Court Act suffers the same Article III standing problem as its claims concerning the Bivens Act and therefore should be dismissed for the same reason. If the Court reaches the merits, however, the claim still should be dismissed: federal law does not authorize courthouse immigration arrests, which means that the Court Act's parallel prohibition is not interfering with or controlling the federal government's operations.

**A.     The federal government is not adverse to the Illinois judges who may issue "judicial orders to protect the privilege from arrest."**

Like the Bivens Act, the Court Act is enforced by private parties under a statutorily created cause of action. 705 ILCS 96/10-25(a). Like the Bivens Act, the Court Act does not task the Governor or Attorney General with any enforcement authority. *Id.* art. 10. And, with one exception, the statute does not provide for enforcement by any other Illinois official. *Id.* So, for the same reasons why the federal government lacks Article III standing to pursue its challenge to the Bivens Act, it also lacks Article III standing to pursue its challenge to the Court Act.

What is that one exception? The Court Act says that, "to maintain access to the court and open judicial proceedings for all persons in their individual capacity and to prevent interference with the needs of judicial administration, a court may issue appropriate *judicial orders* to protect the privilege from arrest." 705 ILCS 96/10-20 (emphasis added). The key phrase is "judicial orders," and it is not defined in the Court Act. But, like all language enacted by the Illinois legislature, the phrase is "given its plain and ordinary meaning." *Cleeton v. SIU Healthcare, Inc.*, 220 N.E.3d 1050, 1055, 2023 IL 128651, ¶ 28; *see Green Plains Trade Group, LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024) (federal courts interpreting Illinois law "must ascertain" the construction that the Illinois Supreme Court "would apply").

11

The plain and ordinary meaning of "judicial orders" is clearly discernable from its common and familiar use in the practice of law: it refers to directions or commands issued by judges in their adjudicatory capacities. *E.g.*, *Lackey v. Stinnie*, 604 U.S. 192, 207 (2025) ("A party 'prevails' when a court conclusively resolves his claim by granting enduring relief on the merits that alters the legal relationship between the parties. Critically, both the change in relationship and its permanence must result from a judicial order."); *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022) ("When a court 'enjoins' conduct, it issues an 'injunction,' which is a judicial order that 'tells someone what to do or not to do.'"); *Whole Woman's Health*, 595 U.S. at 39 (under *Ex parte Young* private parties may "seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law"); *Montoya v. National Railroad Passenger Corporation*, 118 F.4th 900, 902 (7th Cir. 2024) (Federal Arbitration Act "authorizes an interlocutory appeal from any judicial order to bypass arbitration"); *In re Terrell*, 39 F.4th 888, 890 (7th Cir. 2022) ("[A bankruptcy plan] cannot be collaterally attacked and must be obeyed, but like other kinds of judicial orders it may be revisited and changed through authorized means.") (citation omitted); *Democratic National Committee v. Bostelmann*, 977 F.3d 639, 642 (2020) ("[Supreme Court] has stayed judicial orders about elections, prison management, and the closure of businesses.").

Context confirms that the phrase "judicial orders" in section 10-20 of the Court Act refers to directions or commands issued by judges in their adjudicatory capacities. *See, e.g.*, *Rogers v. Imeri*, 999 N.E.2d 340, 343, 2013 IL 115860, ¶ 13 (Illinois statutes are interpreted in context). Recall that the Court Act codifies "the long-standing common law privilege" under which "the parties to a suit and their witnesses are protected from arrest in coming to, attending, and returning from court proceedings." 705 ILCS 96/10-5(10). Traditionally, the privilege was

vindicated by the arrestee's "appear[ing] in the cause in which the arrest was made, and procur[ing] a rule against the plaintiff and his attorney to show cause why the defendant should not be discharged out of custody by reason of his alleged privilege." *Greer v. Young*, 11 N.E. 167, 168, 120 Ill. 184, 188 (1887); *see Stewart v. Ramsay*, 242 U.S. 128, 128-29 (1916). In other words, the privilege was traditionally enforced by "judicial orders": directions or commands issued by judges in their adjudicatory capacities. *See also Dahnke v. People*, 48 N.E. 137, 139, 168 Ill. 102, 107 (1897) ("'Any conduct which is calculated to interfere with the proceedings, by assaulting litigants or witnesses within the precincts of the court, or preventing or hindering, or endeavoring to prevent or hinder, them in their access to the court or otherwise, is a contempt.'").

Because the phrase "judicial orders" in section 10-20 of the Court Act refers to directions or commands issued by judges in their adjudicatory capacities, the analysis remains the same: the federal government is not adverse to the Illinois judges who are authorized to enter these orders and therefore lacks Article III standing to maintain this pre-enforcement challenge to the statute. When judges perform "'function[s] normally performed by a judge,'" it "do[es] not create an Article III case or controversy between [those] judges and the litigants before them." *Frazier*, 140 F.4th at 563 (ruling on bail requests); *see Kellogg*, 149 F.4th at 162 (firearms license application); *Reule*, 114 F.4th at 366 (permission for vexatious litigant to file new action); *Lindke*, 31 F.4th at 493-94 (personal protection order); *accord Homola v. McNamara*, 59 F.3d 647, 649, 651 (7th Cir. 1995) (judge who held party in contempt after he failed to appear for a hearing was "acting as a judge, rather than as an ombudsman or administrative official"); *Diaz v. Cantu*, 123 F.4th 736, 747 (5th Cir. 2024) ("punishing for contempt is a normal judicial function"); *Crooks v. Maynard*, 913 F.2d 699, 700-01 (9th Cir. 1990) (same even when judge holds nonparties in contempt). And Illinois judges who issue "judicial orders to protect the

privilege from arrest" under section 10-20 of the Court Act would be doing just that: performing a function normally performed by judges to preserve the integrity of courtroom proceedings and ensure that the parties before them can litigate their claims. The federal government's challenge to the Court Act therefore fails for lack of subject-matter jurisdiction under Rule 12(b)(1).

### B. The Court Act does not interfere with or control the federal government's operations because federal law does not authorize courthouse arrests.

The federal government's challenge to the Court Act still fails even if the Court reaches the merits (it should not). The intergovernmental immunity doctrine "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up). The federal government relies on the first theory only: it contends that the Court Act "purport[s] to directly regulate the Federal Government." ECF 1 at 19, ¶ 82.

To understand why this claim fails on the merits, focus first on the federal government's alleged harm. It insists that the Court Act directly regulates federal law enforcement agents "[b]y dictating where [they] can effect civil [immigration] arrests." ECF 1 at 18, ¶ 73. Making these arrests in courthouses may "reduce[ ] the risk of flight and safety risks," it says, because people "are usually screened for weapons or other contraband before entering a courthouse." *Id.* at 17, ¶ 71. Plus, it claims, Illinois courthouses are "one of the few predictable locations where [federal agents] can find criminal aliens and safely take them into custody." *Id.* at 17, ¶ 72.

The trouble with this argument arises from its unstated assumption: that federal law authorizes civil immigration arrests in and around Illinois courthouses. After all, the Court Act can curtail the federal government's authority to perform civil immigration arrests only if this authority exists in the first place. And that authority must be located not in appeals to sound policy or best practices but rather in a validly enacted statute. That's because federal agencies

14

like the Department of Justice and Department of Homeland Security, which enforce immigration law, ECF 1 at 4, ¶ 17, have "no power to act . . . unless and until Congress confers power upon" them, *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986).

The weight of authority holds, however, that federal law incorporates the same common law privilege codified in the Court Act and, therefore, does *not* permit civil immigration arrests in and around Illinois courthouses. *United States v. New York*, No. 1:25-CV-744 (MAD/PJE), 2025 WL 3205011, at *11 (N.D.N.Y. Nov. 17, 2025); *Washington v. United States Department of Homeland Security*, 614 F. Supp. 3d 863, 879 & n.21 (W.D. Wash. 2020); *Velazquez-Hernandez v. ICE*, 500 F. Supp. 3d 1132, 1143-44 (S.D. Cal. 2020); *Doe v. ICE*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2020); *New York v. ICE*, 431 F. Supp. 3d 377, 392 (S.D.N.Y. 2019); *but see Ryan v. ICE*, 974 F.3d 9, 24-26 (1st Cir. 2020) (suggesting otherwise). The reasoning is straightforward: There is no serious question that federal courts, like Illinois courts, have long recognized the common law privilege against civil arrests in and around courthouses. And the federal statutes authorizing civil immigration arrests do not demonstrate Congress's intent to abrogate or displace the common law privilege. So, *as a matter of federal law*, the federal government is powerless to make civil immigration arrests in and around courthouses—in Illinois or elsewhere.

"As a starting point, it is patently clear that English common law provided a privilege against any civil arrests in and around courthouses, and also against civil arrests of witnesses and parties necessarily traveling to and from the courthouse." *New York v. ICE*, 431 F. Supp. 3d at 388 (citing sources); *see* 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 289 (1768) ("Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning."). "The purposes of this privilege were both to encourage

15

parties and witnesses 'to come forward voluntarily' and also to maintain order in the courthouse." *New York v. ICE*, 431 F. Supp. 3d at 389 (citations omitted). And while "the privilege goes back to at least the fifteenth century, English courts reconfirmed this privilege in several late eighteenth and early nineteenth century cases, i.e., at the very time that English common law was being incorporated into the laws of the new states of the nascent American republic." *Id.* at 388 (citations omitted); *see Greer*, 11 N.E. at 168, 120 Ill. at 188 (recognizing the privilege); *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 24, 177 Ill. 2d 511, 518 (1997) ("Common law rights and remedies are in full force in [Illinois] unless repealed by the legislature or modified by the decision of our courts.") (citing 5 ILCS 50/1).

The common law privilege against civil arrests in and around courthouses is, importantly, "'the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify.'" *Stewart*, 242 U.S. at 130. "To fulfill its constitutional duties, the court must be open and accessible in reality, and in perception." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145. The privilege helps courts carry out these duties: "consistent with the constitutional right of access to the court, [it] 'enables the citizen to prosecute his rights without molestation, and procure the attendance of such as are necessary for their defence and support.'" *United States v. New York*, 2025 WL 3205011, at *9. "The essence of the privilege is," in short, the very "sanctity of the court." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145.

Although civil immigration arrests are a relatively recent phenomenon, the privilege "plainly" applies to them too. *New York v. ICE*, 431 F. Supp. 3d at 389. For one thing, "the policy objectives cited for hundreds of years by English and American courts to justify the common law

16

privilege against civil courthouse arrests apply equally to modern-day immigration arrests." *Id.* at 391. For another, "Congress enacted the" Immigration and Nationality Act (the statutory authority for those arrests) "in 1952, only twenty years after the Supreme Court reiterated the privilege." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1143 (citing *Lamb v. Schmitt*, 285 U.S. 222 (1932)). And while there may be little "caselaw applying the privilege in this particular context," this does not suggest "that the privilege no longer exists" but rather "that prior administrations viewed the privilege, possessed by a co-equal branch of government, as something so well established and sacrosanct" that they did not "even consider" taking "actions" that might violate it. *United States v. New York*, 2025 WL 3205011, at *10; *see id.* (civil immigration arrests "simply did not occur in state courthouses in light of settled common law protections and because [the federal government's] own policies previously counseled against" them).

So the privilege exists and, on its face, applies to civil immigration arrests. But that is not the end of the inquiry because Congress, of course, may choose to abandon the common law. *E.g.*, *Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981). Has it done so here? The test is stringent: "Congress does not write upon a clean slate" because "statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). Thus, a federal statute is interpreted to "abrogate" federal common law only if the statute "'speak[s] directly' to the question addressed by the common law." *Id.* And a federal statute is interpreted to displace *state* common law only if its text and structure establish that this "is the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (cleaned up).

The Immigration and Nationality Act, however, contains "nothing" that "evinces any congressional intent—let alone a clear and manifest one—to displace the [ ] settled common law

privilege" against courthouse arrests. *United States v. New York*, 2025 WL 3205011, at *11. To be sure, the statute "confers broad authority to make warrantless immigration arrests." *Id.* (citing 8 U.S.C. §§ 1226(a), 1357(a)). But "those sections are silent as to whether such arrests are permitted in courthouses" and thus "do not indicate that Congress intended to abrogate the common-law privilege." *Id.* (citing *Pasquantino v. United States*, 544 U.S. 349 (2005)).

It's also true that a separate section of the statute obliquely references courthouse arrests. The federal government is generally forbidden to use in its immigration enforcement efforts "information furnished solely by" abusers—like "a spouse or parent who has battered the alien or subjected the alien to extreme cruelty." 8 U.S.C. § 1367(a)(1)(A). This restriction is referenced in another provision of the statute governing the notices to appear that are issued to initiate removal proceedings. *See Campos-Chaves v. Garland*, 602 U.S. 447, 451-52 (2024). A notice to appear must "include a statement that the provisions of section 1367 [ ] have been complied with" if the "enforcement action leading to [the] removal proceeding" occurred at specified locations like "a domestic violence shelter" or "a rape crisis center." 8 U.S.C. § 1229(e)(1) & (2)(A). One of those locations is a "courthouse," but only "if the alien [was] appearing in connection with" certain categories of cases, including "domestic violence" and "sexual assault." *Id.* § 1229(e)(2)(B).

"This section suggests that Congress did anticipate at least some arrests occurring at courthouses." *New York v. ICE*, 431 F. Supp. 3d at 393. But not necessarily civil immigration arrests by federal agents. Section 1229(e) may "be read as referring to criminal arrests, against which the [ ] common law privilege does not protect." *Id.* It also may be read not to "speak" to the federal government's "arrest authority at all" but rather to "anticipat[e] criminal arrests by state and local police forces, which lead to eventual [ ] removal proceedings." *Id.* At all events, it would "turn" section 1229(e) "on its head" to find that a provision plainly "intended to protect

18

noncitizens subject to courthouse arrests" in fact reflects congressional intent to subject them to those arrests. *Doe*, 490 F. Supp. 3d at 693. For these reasons, section 1229(e) "falls far short of providing the clear and manifest congressional purpose necessary to supplant the common-law privilege." *United States v. New York*, 2025 WL 3205011, at *12; *see Velazquez-Hernandez*, 500 F. Supp. 3d at 1144 ("reference to courthouse arrest in the 2006 enactment of § 1229(e) is insufficient to find that Congress clearly intended to abrogate the common-law privilege against courthouse arrest when it enacted the [Immigration and Nationality Act] in 1952").

To recap: Federal and state common law recognize the same privilege against civil arrests in and around courthouses. Federal immigration law does not abrogate or displace this privilege. It follows that federal law does not authorize civil immigration arrests in or around courthouses.

And this spells doom for the federal government's intergovernmental immunity challenge to the Court Act. A state law does not unconstitutionally regulate the federal government by preventing it from doing something that it has no authority to do in the first place. *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 207-08 (5th Cir. 2024); *accord United States ex rel. Drury v. Lewis*, 200 U.S. 1, 7-8 (1906); *North Carolina v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990). That's because the intergovernmental immunity doctrine "prohibit[s] States from *interfering with* or *controlling* the operations of the Federal Government." *Washington*, 596 U.S. at 838 (emphasis added); *see, e.g.*, *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (state law requiring federal employees to "desist from perform[ing]" their federal duties "until they satisfy a state officer upon examination that they are competent for a necessary part of them"). Here, the federal government is not allowed to arrest people in or around Illinois courthouse *under federal law*, so the Court Act's parallel prohibition *under state law* does not alter the federal government's operations in any material way and, consequently,

19

cannot plausibly have the effect of interfering with or controlling them.

"Consider a hypothetical": federal law does not authorize immigration enforcement agents to barge into people's homes. *Texas*, 123 F.4th at 208 (citing 8 U.S.C. § 1357(a)(3)). But suppose they do so anyway and, in response, an aggrieved homeowner brings a trespass suit under state common law. "Would intergovernmental immunity prevent [the] homeowner's trespass suit? Of course not. And that would be true even if the agents argued the suit sought to 'control' how they were carrying out their duties." *Id.* A state law like the Court Act that, at most, requires the federal government to conform its conduct to federal law imposes only "an incidental" burden "that comes nowhere near the burdens courts have, in the past, found sufficient to trigger intergovernmental immunity." *Id.* at 207 & n.25 (citing cases); *see McHenry County v. Raoul*, 44 F.4th 581, 592-93 (7th Cir. 2022) (rejecting intergovernmental immunity claim where challenged state law imposed merely an incidental burden on federal government).

There's one final, independent reason why the Court Act does not unconstitutionally regulate the federal government. Its "provisions apply to state-owned facilities"—courthouses— which means that the state "'is acting as a proprietor, not a regulator.'" *United States v. New York*, 2025 WL 3205011, at *17 (quoting *Texas*, 123 F.4th at 205). By "defining, as a proprietor, what activities are not permissible in state-owned facilities," Illinois "is not attempting to regulate federal agents" or "prohibit[ ] the federal government from enforcing immigration law." *Id.* To the contrary, the Court Act merely effectuates the state's interest "to preserve its own property," *Texas*, 123 F.4th at 206, which "does not run afoul of the intergovernmental immunity doctrine," *United States v. New York*, 2025 WL 3205011, at *17.

## CONCLUSION

For these reasons, all the federal government's claims should be dismissed.

Dated: February 23, 2026               Respectfully submitted,

/s/ Darren Kinkead
Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov