IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; KWAME RAOUL, Attorney General of Illinois, in his Official Capacity,<br><br>Defendants. | Case No. 25-cv-2220<br><br>Hon. David W. Dugan |

**BRIEF OF *AMICUS CURIAE* THE CITY OF CHICAGO
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

In this case, Plaintiff challenges the Illinois Court Access, Safety, and Participation Act, 705 ILCS 96/10, et seq. ("CASPA"). That statute protects the integrity of the Illinois justice system by facilitating the appearance and participation of parties and witnesses in judicial proceedings.

This issue is immensely important to the City of Chicago ("City"). The City is home to one fifth of the State's population, and seeks to protect all of its residents, as well as those who work in or visit Chicago, from crime. These efforts depend on victims or witnesses of crime being willing to talk to the police and testify in court. This need for cooperation, moreover, extends to the residents of Chicago's many immigrant communities. Indeed, Chicago is home to nearly 600,000 immigrants, constituting about 22% of the City's population.[1]

The City benefits from laws, like CASPA, that reduce barriers to victims and witnesses attending court. Their participation in judicial proceedings allows law enforcement to fully prosecute criminals and vindicates the Chicago Police Department's diligent efforts to investigate and solve crime. Chicago residents engaged in private civil litigation are also better able to achieve just outcomes when parties and witnesses are able to appear in court.

**ARGUMENT**

In recent months, federal civil immigration agents have wreaked havoc on the City and its surrounding communities. These federal operations resulted in the arrests and harassment of law-abiding residents, including U.S. citizens. Federal agents—almost always concealed behind

---

[1] Amy Qin, *A portrait of immigrants in Chicago: Immigrant population reaches its highest point in nearly two decades*, WBEZ Chicago, Sept. 12, 2025, https://www.wbez.org/immigration/2025/09/12/chicago-immigrant-population-growth-trump-immigration-enforcement (last accessed Feb. 26, 2026).

1

facemasks, and often brandishing military-type weaponry—employed aggressive and unnecessary tactics such as tear gassing peaceful demonstrators, conducting armed building raids, and arresting people at courthouses. Their wanton and indiscriminate approach instilled fear in many Chicagoans—citizens and non-citizens alike—and chilled their participation in many facets of civic life. Businesses in several neighborhoods saw steep declines in patrons and sales, and civil immigration enforcement at courthouses deterred participation in the court system.

In the wake of these events, the State of Illinois and the City have taken various measures to protect public safety. The response includes the State's enactment of CASPA, which codifies Illinois' long-recognized common law privilege against civil arrest in and around courthouses, and provides a remedy when that privilege is violated. CASPA thereby facilitates optimal operation of the justice system in Illinois by alleviating the fear of being arrested for civil violations, including immigration violations, that can deter victims and witnesses from appearing in courthouses to assist with judicial proceedings. Relatedly, CASPA is well-grounded in caselaw upholding regulations that safeguard the proper functioning of governmental property, including courthouses. For these reasons, the City urges the Court to grant Defendants' motion to dismiss.

## I. Recent Immigration Enforcement In Chicago Has Been Haphazard, Dangerous, And Chilling.

On September 8, 2025, the Department of Homeland Security announced the beginning of a new immigration enforcement operation in and around Chicago—Operation "Midway Blitz"—which unleashed a wave of indiscriminate and violent tactics against City residents.[2] The

---

[2] *See generally* Andrew Carter et al., *64 Days in Chicago: The Story of Operation Midway Blitz*, Chicago Tribune, Dec. 28, 2025, https://www.chicagotribune.com/2025/12/28/chicago-immigration-operation-midway-blitz-2/ (last accessed Feb. 26, 2026).

federal government claims that the operation netted 4,500 arrests and has so far released data on 1,895 of the arrestees.[3] Of those, 67% lacked any criminal record.[4] And on the whole, only "1.5% of those detained for immigration-related reasons had been convicted of a violent felony or sex crime."[5] *See also* Dkt. 8 at 10. This data shows that most people arrested by federal agents pose no public safety threat.

Operation Midway Blitz, moreover, swept up citizens. For example, Maria Greeley, a citizen, was surrounded, grabbed, and zip-tied by federal agents shortly after working a double shift.[6] Despite having her passport with her, masked agents who refused to provide their names questioned her for an hour. They refused to believe the passport was real because she did not "look like" a "Greeley."[7] Similarly, Ernesto Diaz, another citizen, was walking down the street when he was surrounded by more than half a dozen federal agents and slammed against a vehicle.[8] The agents never identified themselves and threatened to tase Diaz when he tried to move his arm to be more comfortable. After checking his ID and Social Security card, an agent threw Diaz's wallet to the ground and let him go. Other area residents reported similar stories,

---

[3] *Id.*; Joe Mahr and Laura Rodriguez Presa, *Nearly 1,900 Immigrants Were Detained During the First Half of Operation Midway Blitz. Most Had No Criminal Record.*, Chicago Tribune, Dec. 1, 2025, https://www.chicagotribune.com/2025/12/01/operation-midway-blitz-criminal-record/ (last accessed Feb. 26, 2026).
[4] Mahr & Rodriguez Presa, *supra* note 3.
[5] Carter et al., *supra* note 2.
[6] Gregory Royal Pratt, *ICE Tickets Chicago Man with Legal Residency $130 For Not Having His Papers On Him: 'It's Not Fair…I'm a Resident'*, Chicago Tribune, Oct. 13, 2025, https://www.chicagotribune.com/2025/10/13/ice-fines-chicago-man-for-not-having-papers-on-him/ (last accessed Feb. 26, 2026).
[7] *Id.*
[8] Laura Rodriguez Presa et al., *Latino US Citizens Racially Profiled by Federal Immigration Agents in Chicago: 'I Felt Like a Piece of Trash'*, Chicago Tribune, Nov. 15, 2025, https://www.chicagotribune.com/2025/11/15/latino-us-citizens-racially-profiled-immigration-chicago/ (last accessed Feb. 26, 2026).

including one citizen who was arrested and brought to an ICE detention center with his father. When he informed agents that he was a citizen and knew his rights, "[a]ll they said was, I don't (expletive) care."[9]

Indeed, federal tactics have been shockingly aggressive and violent. For example, a federal immigration agent used his vehicle to sideswipe Marimar Martinez, a citizen, as she drove on city streets.[10] The agent then exited his car and shot Martínez five times. Text messages reveal that the agent bragged that he "fired 5 shots and she had 7 holes."[11] One agent described him as a "legend among agents" and offered to buy him drinks for shooting Martínez.[12] Commander-at-large Gregory Bovino praised the agent shortly after the shooting, telling the agent "[i]n light of your excellent service in Chicago, you have much left to do!!"[13] While the federal government initially accused Martínez of being a "domestic terrorist" and criminally attacking the federal agents, video footage has since put the lie to that tale; the federal government has dropped all charges against her; and she is seeking damages against the agents under the Federal Tort Claims Act.[14]

---

[9] *Id.*
[10] Jason Meisner et al., *Border Patrol Cmdr. Gregory Bovino Praised Agent After Shooting Marimar Martinez in Chicago, Evidence Shows*, Chicago Tribune, Feb. 10, 2026, https://www.chicagotribune.com/2026/02/10/marimar-martinez-video-release-bovino/ (last accessed Feb. 26, 2026).
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Jon Seidel, *Border Patrol Agents Say 'Time to Get Aggressive' in Footage that Contradicts Claims Against Marimar Martinez*, Chicago Sun-Times, Feb. 10, 2026, https://chicago.suntimes.com/immigration/2026/02/10/marimar-martinez-the-chicago-woman-shot-by-border-patrol-agent-expected-to-file-lawsuit-release-evidence (last accessed Feb. 26, 2026); Sophia Tareen, *Lawyers of Chicago Woman Shot by Federal Agents Say Documents Show How DHS Lies About Investigations*, Associated Press, Feb. 12, 2026, https://www.pbs.org/newshour/politics/lawyers-of-chicago-woman-shot-by-federal-agents-say-documents-show-how-dhs-lies-about-investigations (last accessed Feb. 26, 2026).

In another instance, in what was described as a "military-style siege," agents broke down doors and smashed windows inside a 130-unit mid-rise apartment building at 7500 S. Shore Drive.[15] Agents held guns and wore tactical gear as they entered the building via a ladder, and snipers descended from helicopters to land on the roof.[16] Residents, including citizens, were zip-tied and put into rented box trucks outside, some only partially clothed.[17] Witnesses described seeing several children separated from their parents and zip-tied.[18]

Federal agents have also repeatedly deployed tear gas, other munitions, and force inappropriately, endangering residents and causing widespread fear. *See Chicago Headline Club v. Noem*, --- F. Supp. 3d ---, 25-C-12173, 2025 WL 3240782, at *86 (N.D. Ill. Nov. 20, 2025). In one incident, agents arrested a man as neighbors were preparing for a children's Halloween parade on a neighborhood street. *Id.* at *60. Despite body camera footage showing that neighbors protesting the arrest were peaceful, agents unleashed tear gas and tackled multiple people to the ground, one of whom suffered a traumatic brain injury and another who was seventy years old. *Id*. One tear gas cannister caught fire. *Id.* Ultimately, the children's parade had to be cancelled, and the Halloween activities were limited to school grounds. *Id.* A judge in the Northern District of Illinois held that federal immigration agents' conduct likely violated Fourth Amendment rights and "shock[ed] the conscience." *Id.* at *86.

---

[15] Andrew Carter et al, *They Were Already living in One of Chicago's Worst Apartment Buildings. Then Came the ICE Raid.,* Chicago Tribune, Oct. 19, 2025, https://www.chicagotribune.com/2025/10/19/ice-chicago-apartment-raid/ (last accessed Feb. 26, 2026).
[16] *Id.*
[17] *Id.*
[18] *Id.*

Given these shocking and widespread immigration enforcement tactics, it comes as no surprise that many Chicagoans, whether citizens or not, have hesitated to participate in public life in the wake of Operation Midway Blitz. As just one example, businesses in several neighborhoods suffered steep drops in patronage due to immigration enforcement fears. The 26th Street corridor in Chicago's Little Village, a hub of Chicago's Hispanic community and normally the second-busiest commercial corridor in the City, saw 50-60% drops in sales in January 2025 in anticipation of immigration efforts.[19] And during Operation Midway Blitz, some restaurants in Little Village saw a 70% decline in revenue, with 20% of workers reporting that they were afraid to come in.[20] Similar patterns were reported in other neighborhoods.[21]

## II. Aggressive Civil Immigration Enforcement Deters Residents From Participating In The Judicial System.

The immigration sweeps in the Chicago area have extended to courthouse detentions. In Cook County, at least a dozen people were arrested in and around county courthouses from July

---

[19] Joanna Hernandez, *Business Owners in Little Village, Back of the Yards say Sales Declining Amid Fears of ICE Raids*, WTTW, Jan. 30, 2025, https://news.wttw.com/2025/01/30/business-owners-little-village-back-yards-say-sales-declining-amid-fears-ice-raids (last accessed Feb 26, 2026).

[20] Julian Crews, *Fear of ICE Raids Devastating Little Village Restaurants and Small Businesses*, WGN, Oct. 17, 2025, https://wgntv.com/news/operation-midway-blitz/fear-of-ice-raids-devastating-little-village-restaurants-and-small-businesses/ (last accessed Feb. 26, 2026).

[21] Ariel Parrella-Aureli, *Belmont-Cragin Business Owners Beg For Support As ICE Fears Devastate Sales and Closures Loom*, Block Club Chicago, Oct. 17, 2025, https://blockclubchicago.org/2025/10/17/belmont-cragin-business-owners-beg-for-support-as-ice-fears-devastate-sales-and-closures-loom/ (last accessed Feb. 26, 2026); Maggie Hennessy, *Belmont Cragin Restaurant Owners Say Business Ticking Up – But Not Back to Pre-Immigration Enforcement Levels*; WBEZ Chicago, Dec. 5, 2025, https://www.wbez.org/food-drink/2025/12/05/belmont-cragin-restaurants-chicago-immigration-enforcement-chicago-food (last accessed Feb. 26, 2026); Hi India, *Post the Ice Raids, Chicago's Desi Quarter Devon Avenue Bears a Deserted Look*, Hi India, Feb. 6, 2025, https://hiindia.com/post-the-ice-raids-chicagos-desi-quarter-devon-avenue-bears-a-deserted-look/ (last accessed Feb. 26, 2026).

6

through mid-October 2025.[22] At least two people were arrested near a domestic-violence courthouse.[23] One woman was arrested by federal agents 15 minutes before she was scheduled to appear in court.[24] Her charges were dropped that day.[25] Less than two weeks later, Chicago police were dispatched to the same courthouse after an employee of the Cook County Public Defender's Office reported someone in plainclothes in an unmarked vehicle with an assault-style rifle, who turned out to be a federal agent.[26] Federal immigration agents were later seen again that day around the courthouse.[27] Agents also arrested two people outside of a county courthouse on the City's West Side.[28] Indeed, the Complaint in this case itself suggests that arresting immigrants in and around courthouses is a favored strategy of immigration enforcement agents. *See* Compl. ¶ 71.

This chills residents from showing up in court, whether to pursue their own case or serve as a witness. Members of the legal community report that their clients are too fearful to come into courtrooms.[29] A program director and policy advisor at Family Rescue, a Chicago non-profit

---

[22] Christine Fernando, *County Judge in Chicago Area Bars ICE From Arresting People at Court*, Associated Press, https://apnews.com/article/chicago-illinois-ice-immigration-court-arresting-a1d9641502d6a97db077c973ec93a6e7 (last accessed Feb. 26, 2026).

[23] Madeline Buckley and William Tong, *ICE Agents Detain 2 at County Domestic Violence Courthouse This Week. Advocates Warn of Chilling Effect on Victims.*, Chicago Tribune Sept. 4, 2025, https://www.chicagotribune.com/2025/09/04/immigration-domestic-violence-court/ (last accessed Feb. 26, 2026).

[24] Sabrina Franza, *ICE Agents Detain Woman at Domestic Violence Courthouse in Chicago, Witnesses Say*, CBS Chicago, Sept. 3, 2025, https://www.cbsnews.com/chicago/news/ice-agents-detain-woman-domestic-violence-courthouse/ (last accessed Feb. 26, 2026).

[25] *Id.*

[26] Mitchell Armentrout and Sophie Sherry, *Federal Agents Make Immigration Arrests in West Chicago and at West Side Courthouse*, Chicago Sun-Times, Sept. 15, 2025, https://chicago.suntimes.com/immigration/2025/09/15/ice-west-chicago-arrests-federal-agents-immigration (last accessed Feb 26, 2026).

[27] *Id.*

[28] *Id.*

[29] Fernando, *supra* note 22.

that provides comprehensive support to victims of domestic violence, explained that domestic violence victims have been reticent to come to court due to civil immigration enforcement.[30] Recognizing these fears, on October 14, 2025, Circuit Court of Cook County Chief Judge Timothy Evans issued General Administrative Order No. 2025-10, which prohibits civil arrests at all courthouses in the Circuit Court of Cook County. The order recognizes that the "fair administration of justice requires that courts remain open and accessible, and that litigants and witnesses may appear without fear of civil arrest." General Administrative Order No. 2025-10 at 1.

CASPA's legislative findings, too, make clear that the fear of civil arrest is interfering with the operation of courts in Illinois. The General Assembly found that "[v]ictims and witnesses are increasingly reluctant to attend and participate in court proceedings . . . out of fear of civil arrests when going to, remaining at, or returning from a court proceeding." 705 ILCS 96/10-5(4). The threat of civil courthouse arrests also harms other participants in the legal system. For example, the General Assembly found that "court staff bear increased burdens" due to case delays and postponements, and attorneys' ability to "zealously advocate for their clients . . . is threatened and impeded" by courthouse civil arrests. 705 ILCS 96/10-5(6), (7). In short, civil arrests of individuals at courthouses "threaten[] the functioning of the court system and the fair administration of justice" as well as the "public's right to seek justice in the courts." 705 ILCS 96/10-5(8), (9).

---

[30] Franza, *supra* note 24.

### III. The Fear Of Appearing In Court Undermines The City's Ability To Fight Crime.

The unselective and aggressive nature of federal immigration operations instills fear in many residents, including immigrants. This fear, in turn, undermines the City's ability to fight crime and threatens the significant strides the City has made in reducing crime.

In 2025, violent crime in Chicago fell to the lowest it had been since the mid-1960s,[31] declining 22.7% from the previous year.[32] Homicides were down 28.8%, and shootings were down 34.4%.[33] In higher crime neighborhoods, the reductions were even more dramatic.[34] In tandem with the decrease in violent crime, arrest rates for both violent crime and overall crime in the City increased.[35] And the City has hired upwards of 200 additional detectives to solve more crimes, which has increased the homicide clearance rate to 77.4%, the highest in more than a decade.[36]

The willingness of Chicagoans to step forward and work with the police is critical to these efforts. To prevent and solve crime, the police depend on tips or statements from the

---

[31] Office of the Mayor, *2025 Year in Review: Building the Safest, Most Affordable Big City in America*, December 31, 2025, https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/december/2025-year-in-review.html (last accessed Feb 26, 2026).

[32] Mayor's Office of Community Safety, *Violence Reduction Dashboard*, December 31, 2025, https://www.chicago.gov/city/en/sites/vrd/home.html (last accessed Feb 26, 2026).

[33] *Id.*

[34] Office of the Mayor, *supra* note 31.

[35] Chicago Data Portal, *Crimes, 2001 to Present,* City of Chicago, Feb. 26, 2026 https://data.cityofchicago.org/stories/s/Crimes-2001-to-present-Dashboard/5cd6-ry5g (last accessed Feb. 26, 2026).

[36] Office of the Mayor, *Two Years of Investing in People*, May 15, 2025, https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/may/Two-Years-Of-Investing-In-People.html (last accessed Feb. 26, 2026); Office of the Mayor, *FACT SHEET: City of Chicago Continues to Record Historic Declines in Violent Crime Under Mayor Brandon Johnson*, August 25, 2025, https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/august/Fact-Sheet-2025-Crime-Decline.html (last accessed Feb. 26, 2026).

victims or witnesses of crime, no matter their immigration status. To that end, the City has implemented the People's Plan for Community Safety, which focuses on "[b]uild[ing] trust between community, law enforcement, and other response groups."[37] This trust is necessary because "[p]olice officials rely on the cooperation of community members to provide information about crime in their neighborhoods."[38] And to help ensure that the City's immigrant community is not discouraged from talking to the police due to fears of deportation, the City's Welcoming City Ordinance, Municipal Code of Chicago ("MCC") § 2-173-005, et seq, keeps Chicago police separate from civil immigration enforcement. A federal judge in the Northern District of Illinois recently upheld this ordinance against a claim, like that here, that it regulates the federal government. *United States v. Illinois*, 796 F. Supp. 3d 494, 535-36 (N.D. Ill. 2025). The Seventh Circuit, moreover, has recognized that the City is "clearly in the best position to determine the security needs of [its] own communit[y]," *City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018), and is entitled to decide "that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences," *City of Chicago v. Barr*, 961 F.3d 882, 891–92 (7th Cir. 2020).

But fighting crime requires more than talking to the police. Residents must also be willing to attend court proceedings to hold perpetrators accountable for their crimes. If victims and witnesses fear that going to court will put them at risk for civil immigration arrest, investigations and prosecutions may fall apart for lack of critical witness testimony.

---

[37] Office of the Mayor, *People's Plan for Community Safety: Year One Report*, at 18, https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/YEARONE%20REPORT.pdf.
[38] *Id.* at 19.

10

CASPA counters this harmful dynamic and facilitates participation in the criminal justice system and cooperation with prosecutors. It does this by conferring a privilege from civil arrest in or near a courthouse on those people who are a party, witness, potential witness, or their court companion. 705 ILCS 96/10-15(a). CASPA is a tailored response to the threat imposed on the Illinois court system by civil arrests at courthouses. It advances, rather than restricts, the enforcement of the law though judicial proceedings.

IV. **CASPA Is A Lawful Means To Protect The Functioning Of The Justice System And Law Enforcement In Chicago.**

As the Defendants explain in their motion to dismiss, Dkt. 8, CASPA is lawful, and the Complaint's challenge to CASPA should be dismissed. Indeed, CASPA merely codifies the longstanding common law privilege against civil arrest at or near a courthouse. Nearly 150 years ago, the Illinois Supreme Court made clear that the "parties to a suit and their witnesses are, for the sake of public justice, protected from arrest in coming to, attending upon, and returning from the court." *See Greer v. Young*, 11 N.E. 167, 169 (Ill. 1887) (citation and emphasis omitted). The Illinois Appellate Courts have since affirmed the privilege against arrest. *See, e.g., Jones v. Jones*, 40 Ill. App. 2d 217, 225 (Ill. 1st Dist. 1963).

Illinois is in good company in recognizing this privilege from civil courthouse arrest. In rejecting the federal government's recent challenge to a New York law similar to CASPA, a federal court acknowledged the deep historical roots of New York's "common law privilege against civil courthouse arrests," which "evolved as a means to encourage parties, as well as witnesses, to appear in court voluntarily and to enable the proper, expeditious, and uninterrupted functioning of courts." *See United States v. New York*, 1:25-CV-744, 2025 WL 3205011, at *8–9 (N.D.N.Y. Nov. 17, 2025) (cleaned up); *see also Person v. Grier*, 66 N.Y. 124, 125 (1876) ("It is the policy of the law to protect suitors and witnesses from arrests upon civil process while

coming to and attending the court and while returning home"). The Supreme Court of New Jersey has also described the "ancient roots" of immunity from civil arrest while attending court. *Wangler v. Harvey*, 41 N.J. 277, 280 (1963). The court explained that the privilege protects parties' ability "to procure, without difficulty, the attendance of all such persons as are necessary to manifest [their] rights," and avoids arrests that would "adversely affect the functions of a court." *Id.* at 280–81, 284.

States have considerable leeway to enact laws, like CASPA, that protect the integrity of the judicial process. The Supreme Court has explained that "the courtroom and courthouse premises are subject to the control of the court," and "courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 358, 363 (1966). No one "coming under the jurisdiction of the court," including "enforcement officers . . . should be permitted to frustrate its function." *Id*. The Seventh Circuit likewise recognizes that it is critical to "preserv[e] a calm atmosphere for the sake particularly of the lay people—witnesses and jurors, outsiders to the legal system—who nevertheless play a vital role in the administration of justice." *Braun v. Baldwin*, 346 F.3d 761, 765 (7th Cir. 2003).

In line with these precedents, the Seventh Circuit has upheld a rule prohibiting wearing masks inside a courthouse. Wearing masks, the court explained, "implies intimidation"; "masked people sitting in the spectator section of the courtroom" could frighten "a witness in a criminal case . . . or a juror." *Ryan v. Cnty. of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). Similarly, courts have upheld rules forbidding "[t]aking photographs, films or videotapes, or audiotaping … in a courthouse including any courtroom, office or hallway thereof," *Leibovitz v. Barry*, 15-CV-1722, 2016 WL 5107064, at *7 (E.D.N.Y. Sept. 20, 2016) (citations and internal quotation marks

12

omitted), and requiring all persons entering a courthouse submit to a search, due to the "concerns stemming from threats and episodes of violence affecting public buildings." *Justice v. Elrod*, 649 F. Supp. 30, 31–32 (N.D. Ill. 1986), *aff'd*, 832 F.2d 1048 (7th Cir. 1987). Society's interest in the integrity of judicial proceedings is so strong that it can justify curtailing even core constitutional activities, such as free speech or the right to bear arms, that can impair proper courthouse functioning. *See Cox v. Louisiana*, 379 U.S. 559, 562 (1965) (upholding law restricting picketing near courthouse as a "safeguard[] necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence"); *Hodge v. Talkin*, 799 F.3d 1145, 1165 (D.C. Cir. 2015); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022) (acknowledging the legality and tradition of laws forbidding the carrying of firearms in sensitive places such as courthouses).

It is the States, moreover, that "possess primary authority for defining and enforcing the criminal law." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). If States were denied the ability to address practices within and around their courthouses that undermine the enforcement of the criminal law, their traditional police powers would be diminished, and the public would be less safe.

Finally, as explained by the Defendants, Dkt. 8 at 22–28, CASPA does not violate the intergovernmental immunity doctrine, because it is not a direct regulation of the federal government. Among other reasons, CASPA is merely an exercise of the State's authority, in a proprietary capacity, to manage activity in State courthouses. *See Texas v. United States*, 123 F.4th 186, 205–06 (5th Cir. 2024) (rejecting federal government's direct regulation challenge

13

where Texas, in seeking to "prevent trespass and property damage" to state property, was merely "acting as a proprietor" and not as a "regulator" of federal agents)*; see also id.* at 192 ("Texas is seeking, not to 'regulate' Border Patrol, but only to safeguard its own property")*, accord Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.") (internal citations omitted). CASPA therefore does not amount to unlawful direct regulation of the federal government.

## CONCLUSION

For the foregoing reasons, as well those articulated in Defendants' Motion to Dismiss the Complaint, this Court should grant that motion.

Date:   February 27, 2026

Respectfully submitted,

MARY B. RICHARDSON-LOWRY,
Corporation Counsel of the City of Chicago

By: /s/ *Andrew Worseck*
Andrew Worseck
Deputy Corporation Counsel

ANDREW WORSECK
andrew.worseck@cityofchicago.org
HANNAH GELBORT
hannah.gelbort@cityofchicago.org
AUSTIN CARSH
austin.carsh@cityofchicago.org
City of Chicago, Department of Law
Constitutional and Commercial
  Litigation Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7129

*Attorneys for Amicus Curiae City of Chicago*