# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | Case No. 3:25-cv-02220 |
| Plaintiff | ) | |
| | ) | Hon. David Wayne Dugan |
| v. | ) | |
| | ) | |
| **STATE OF ILLINOIS; JB** | ) | |
| PRITZKER, Governor of Illinois, in his | ) | |
| Official Capacity; KWAME RAOUL, | ) | |
| Attorney General of Illinois, in his Official | ) | |
| Capacity, | ) | |
| Defendants. | ) | |

---

## BRIEF *AMICI CURIAE* OF ORGANIZATIONS PROVIDING LEGAL AND SOCIAL SERVICES TO LOW-INCOME ILLINOISANS

---

Sharone R. Mitchell, Jr.
Public Defender of Cook County
Law Office of the Cook County Public Defender
69 West Washington Street
Suite 1600
Chicago, IL 60602

*Counsel for the Law Office of the Cook County Public Defender.*

Daniel Schneider (ARDC #6327877)
Legal Action Chicago
200 N. LaSalle St., Ste. 1540
Chicago, Illinois 60603
(312) 423-5941
dschneider@legalactionchicago.org

Alexa Van Brunt
Noor Tarabishy
Jonathan Manes
MACARTHUR JUSTICE CENTER
160 East Grand Ave, 6th Floor
Chicago, IL 60611
(312) 503-1336
alexa.vanbrunt@macarthurjustice.org

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................. ii

**STATEMENT OF INTEREST OF AMICI CURIAE** ..................................................... 1

**ARGUMENT** ...................................................................................................... **5**

I.    THE PRIVILEGE AGAINST CIVIL COURTHOUSE ARRESTS, LONG RECOGNIZED IN ILLINOIS, IS FUNDAMENTAL TO THE ADMINISTRATION OF JUSTICE. ....................................................................................................... 5

II.    DISREGARD OF THE PRIVILEGE AGAINST CIVIL COURTHOUSE ARRESTS HAS UNDERMINED COURT OPERATIONS AND ACCESS TO JUSTICE…..7

    A.    DHS' Prior Approach to Courthouse Arrests…………………………………7

    B.    DHS' Sudden Decision to Widely Disregard the Common Law Privilege Against Courthouse Arrest…………………………………………………………………..9

    C.    Immigration Arrests at Courthouses in Northern Illinois Created a Severe Chilling Effect on Court Operations, Undermined the Administration of Justice, and Harmed *Amici*'s Clients…………………………………………………………………...10

III.    CASPA IS A LEGITIMATE EXERCISE OF THE STATE'S PREROGATIVE TO PROTECTS ITS COURT SYSTEM AND THE PEOPLE THAT IT SERVES…...17

**CONCLUSION**…………………………………………………………………...**19**

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. U.S. Immigr. & Customs Enf't Chicago Field Office*,
    346 F. Supp. 3d 1174 (N.D. Ill. 2018) ................................................................. 8
*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................... 7
*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*,
    398 U.S. 281 (1970) ......................................................................................... 17
*Brown v. New Jersey*,
    175 U.S. 172 (1899) ......................................................................................... 17
Cook County Cir. Ct.,
    Gen. Admin. Order 2025-10 ........................................................................ 17, 18
*Doe v. U.S. Immigr. & Customs Enf't*,
    490 F. Supp. 3d 672 (S.D.N.Y. 2020) ........................................................... 6, 19
*Greer*,
    11 N.E. 167 (Ill. 1887) .................................................................................. 5, 19
*I.N.S. v. Lopez-Mendoza*,
    468 U.S. 1032 (1984) .......................................................................................... 7
*Jones v. Jones*,
    189 N.E.2d 33 (Ill. App. Ct. 1963) ............................................................... 5, 19
*Lamb v. Schmitt*,
    285 U.S. 222 (1932) ......................................................................................... 19
*Long v. Ansell*,
    293 U.S. 76 (1934) ........................................................................................... 19
*N.Y. v. U.S. Immigr. & Customs Enf't*,
    431 F. Supp. 3d 377 (S.D.N.Y. 2019) .............................................................. 19
*N.Y.*,
    431 F. Supp. ...................................................................................................... 19
*Nava v. Dep't of Homeland Security*,
    435 F. Supp. 3d 880 (N.D. Ill. 2020) ................................................................. 8
*Page Co. v. MacDonald*,
    261 U.S. 446 (1923) ......................................................................................... 19
*Ryan v. U.S. Immigr. & Customs Enf't*,
    974 F.3d 9 (1st Cir. 2020) ................................................................................ 17
*Stewart v. Ramsay*,
    242 U.S. 128 (1916) ...................................................................................... 6, 19
*U.S. Dep't of Homeland Security*,
    614 F. Supp. 3d 863 (W.D. Wash. 2020) .......................................................... 19
*United States. v. N.Y.*,
    No. 1:25-cv-744 (MAD/PJE), 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025) ......... 19
*Wangler v. Harvey*,
    41 N.J. 277 (1963) ........................................................................................ 5, 19
*Williamson v. United States*,
    207 U.S. 425 (1908) ......................................................................................... 19

**Statutes**

8 U.S.C. § 1226(a) ............................................................................................. 8

8 U.S.C. § 1357(a)(2) ........................................................................................ 8

10 ILCS 5/18-7 .................................................................................................. 6

20 ILCS 1807/9 ................................................................................................. 6

70 ILCS 1325/1(a) ............................................................................................ 6

405 ILCS 5/3-606 ............................................................................................. 6

705 ILCS 96/10 ................................................................................................. 1

735 ILCS 5/12-107 ........................................................................................ 6, 7

**Regulations**

8 CFR § 241.2(a)(1) ......................................................................................... 8

## STATEMENT OF INTEREST OF AMICI CURIAE

*Amici curiae* represent a cross-section of the legal community and social services providers serving low-income Illinoisans: criminal defense lawyers, advocates against gender-based violence, consumer law specialists, immigration attorneys, class action litigators, civil legal service providers, and social service agencies. Their interest in the subject matter of this litigation is profound, cutting to the heart of their work in communities across the state. *Amici* have relied, and continue to rely, on the common law privilege against civil courthouse arrests to ensure that their clients, staff, and witnesses can have free and clear access to Illinois' court system.

Today, thanks to the work of the Illinois General Assembly, they rely on the explicit codification of that long-recognized privilege through the Court Access, Safety, and Participation Act ("CASPA"), 705 ILCS 96/10, *et seq*. CASPA recognizes  that courts can only serve the interests of justice when parties, witnesses, and attorneys can access them without fear of being harassed, handcuffed, and hauled off to address unrelated civil matters. *See id.* § 96/10-5. *Amici* submit this brief to provide crucial context for the Court as it considers the State's well-founded request to dismiss the United States' Complaint. They provide background on the privilege against civil courthouse arrests in Illinois and striking, recent examples of the threats to justice that it is meant to address.

*Amici* are as follows:

**Apna Ghar** is a community organization that provides critical, comprehensive, culturally competent services and conducts advocacy across Illinois communities to end gender-based violence, with a particular focus on immigrant and refugee communities who often face compounded barriers to safety and justice.

**Ascend Justice**, formerly known as the Domestic Violence Legal Clinic, is a legal services organization that has served survivors of gender-based violence with free legal services for more

1

than 40 years. Ascend Justice's mission is to empower individuals and families impacted by gender-based violence or the child welfare system to achieve safety and stability through holistic legal advocacy and system reform. Since 2005, Ascend Justice attorneys and volunteers have worked from offices inside the Cook County Domestic Violence Courthouse, providing onsite legal assistance to tens of thousands of survivors seeking Orders of Protection. Ascend Justice also offers the holistic legal advocacy necessary for survivors of gender-based violence to become safer and more independent, ranging from representation in child custody and support cases, to immigration, housing, employment and consumer matters.

The **Chicago Alliance Against Sexual Exploitation ("CAASE")** is a community organization that addresses the culture, institutions, and individuals that perpetrate, profit from, or support sexual exploitation. Their work includes prevention, policy reform, community engagement, and legal services. Their attorneys provide free legal services to survivors of sexual assault and sex trafficking in civil and criminal courts in the Chicagoland area.

**Cabrini Green Legal Aid** was formed in 1973 as a neighborhood-based, faith-inspired legal clinic at the request of residents of the Cabrini-Green housing projects. Today, CGLA provides holistic legal and support services to people who are negatively impacted by the criminal legal system across Chicago and Cook County. CGLA also provides comprehensive outreach, education and advocacy at the local and state levels. CGLA's practice areas include criminal defense, family law, housing matters, and criminal records mitigation focused on removing barriers to housing, employment, and education.

**Family Rescue** is an Illinois nonprofit providing comprehensive services to domestic violence survivors and their families. Family Rescue has many clients who are immigrants or are part of mixed-status households. Family Rescue has served thousands of survivors and their children, providing counseling, housing assistance, legal advocacy, and community outreach.

2

The **Illinois Coalition Against Domestic Violence** is the federally designated statewide coalition of 55 domestic violence services providers plus dozens of community partner agencies. ICADV's member organizations provide services to survivors in all 102 counties throughout Illinois.

The **Illinois Coalition for Immigrant and Refugee Rights** is the state's largest immigrant advocacy organization. ICIRR is dedicated to promoting the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society. Such rights include the ability to pursue justice through the courts and pursue policies benefiting immigrants and refugees at all levels of government. ICIRR has been deeply involved in monitoring and organizing response to the increase of federal immigration enforcement activity throughout 2025, including arrests at courthouses throughout Illinois. ICIRR has been actively engaged in crafting and advocating for state and local legislation to protect and welcome immigrants, including the Court Access, Safety, and Participation Act, the Illinois law that attempts to reassure immigrants as they participate in our legal system.

The **James B. Moran Center for Youth Advocacy** is a community-based legal and social services provider serving youth and families in Evanston and the surrounding areas. The Moran Center provides holistic and integrated legal services, social work, and restorative services.

The **Law Center for Better Housing** provides renters with comprehensive legal and supportive services to preserve housing and promote long term stability, offering high quality eviction defense, pre-eviction assistance, and help with issues such as illegal lockouts, unsafe conditions, discrimination, and retaliation. Its clients include tenants facing discrimination and harassment by their landlords based on their actual or perceived immigrant status. Working closely with Supportive Services case managers, LCBH attorneys also help renters address financial challenges and secure more stable housing options. Most services are delivered through court-

based referrals, which together make up the bulk of LCBH's caseload, while more than 500 additional renters each year receive help through community referrals, outreach, and LCBH's housing hotline.

**The Law Office of the Cook County Public Defender** is the largest criminal defense law firm in Illinois, with more than 500 attorneys and over 700 employees overall. Through advocacy and direct legal representation, the public defender seeks to protect the fundamental rights, liberties, and dignity of each person whose case it is assigned to defend. Each year, the public defender represents tens of thousands of Cook County residents in criminal and juvenile proceedings, DCFS administrative hearings, immigration court, and other matters in and outside of county courtrooms.

**Legal Action Chicago** is a nonprofit law firm committed to dismantling systemic racism and advancing economic justice, and which partners with civil legal service providers across Cook County and beyond to help understand and protect the rights of low-income residents and remove barriers to their advancement.

**Legal Aid Society of Metropolitan Family Services** is a nonprofit law firm that has spent decades providing support to communities in Chicago, including and especially to survivors of domestic violence. LAS provides legal representation and assistance on domestic violence, family law, consumer and housing issues, elder abuse and financial exploitation, human trafficking, and victims of crime.

**Life Span** is a comprehensive domestic and sexual violence organization providing legal representation, criminal court advocacy and counseling services to thousands of survivors in Cook County each year.

**Mujeres Latinas en Acción** is community-based organization serving Latinas, survivors, and immigrant families across the Chicago area.

4

**The Network: Advocating Against Domestic Violence** is a collaborative membership organization of more than 40 direct service organizations working in Illinois and beyond to improve the lives of survivors and the programs serving them through education, policy and advocacy to bring an end to society's tolerance of gender-based violence.

**Westside Justice Center (WJC)** works to address both legal and life challenges that disproportionately affect marginalized communities in Illinois, particularly those on the west side of Chicago. Many of the individuals WJC serves have experienced systemic discrimination, over-policing, and other structural barriers that limit access to housing, employment, education, and community stability.

**ARGUMENT**

## I. THE PRIVILEGE AGAINST CIVIL COURTHOUSE ARRESTS, LONG RECOGNIZED IN ILLINOIS, IS FUNDAMENTAL TO THE ADMINISTRATION OF JUSTICE.

Illinois has long recognized the common law privilege against civil arrest within and near courthouses. In *Greer v. Young,* the Illinois Supreme Court affirmed that "parties to a suit and their witnesses are, for the sake of public justice, protected from *arrest* in coming to, attending upon, and returning from the court."[1] *Greer*, 11 N.E. 167, 169 (Ill. 1887) (emphasis in original). This protection extended to parties and witnesses to "any matter pending before a lawful tribunal having jurisdiction of the cause." *Id. Greer* confirmed that the privilege was "expressly limited to cases of arrest on civil process." *Id.* at 168 (citing 1 Tidd, (1st Amer. Ed.) 174; 3 Bl. Comm. 289, side p. 1; Greenl. Ev. §§ 316, 317; 2 Bouv. Dict. 284)). The Court relied on well-established English law under which "all persons who had relation to a suit which called for their attendance, whether

---

[1] The Illinois Appellate Court has since affirmed *Greer's* enunciation of the privilege. *See Jones v. Jones*, 189 N.E.2d 33, 37 (Ill. App. Ct. 1963); *see also Wangler v. Harvey*, 41 N.J. 277, 281-82 (1963) (citing *Greer*).

5

they were compelled to attend by process or not, . . . were intitled to privilege from arrest eundo et redeundo."[2] *Meekins v. Smith* (1791) 126 Eng. Rep. 363.

Illinois has thus consistently supported the rule that individuals are entitled to protection against arrest on civil matters when coming to, going from, or attending court proceedings. This is a critical protection given the wide variety of civil arrests authorized by law, the execution of which risks hampering criminal and civil cases alike if parties, witnesses, and lawyers can be arrested for non-criminal reasons unrelated to their court proceedings. These types of civil arrests include immigration arrests, but also civil commitment orders, courts martial, election law breaches, orders to pay civil judgments, and even violations of non-criminal municipal ordinances in some circumstances. 405 ILCS 5/3-606; 20 ILCS 1807/9; 10 ILCS 5/18-7; 70 ILCS 1325/1(a); 735 ILCS 5/12-107.

If the privilege is discarded, courthouse participation becomes a gamble with liberty, undermining courts as forums of justice. Parties weighing whether to seek protection, witnesses deciding whether to testify, and attorneys advising their clients would all be forced to calculate not the merits of their case, but the risk of unrelated civil arrest the moment they step out of their homes towards the courthouse doors. The inevitable result is fewer appearances, abandoned claims and defenses, dismissed prosecutions, and a legal system rendered hollow by fear. In 2017, after reports of courthouse arrests by immigration agents arose during the prior Trump administration— though on a more limited basis than experienced in Illinois in 2025—the Chief Justice of the

---

[2] *See also, e.g.*, C*ole v. Hawkins* (1738) 95 Eng. Rep. 396 ("[I]f the serving of process upon persons attending Courts were to be allowed, it would produce much terror and great distraction in business."); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916) ("Courts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them.") (citation omitted); *see also Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 690 (S.D.N.Y. 2020) ("To permit arrest to be made in court or while persons were coming or returning would give occasion to perpetual tumults, discourage witnesses from coming forward voluntarily, and was altogether inconsistent with the decorum which ought to prevail in a high tribunal") (cleaned up).

6

Illinois Supreme Court voiced concern over the chilling effect of these arrests on access to justice.[3]
He directed court personnel across the state to report encounters to the Office of the Chief Justice
and to the Administrative Office of the Illinois Courts. The Chief Justice determined that such
operations at courthouses "infringe on the powers reserved to the states and threaten state
sovereignty."[4]

## II.     DISREGARD OF THE PRIVILEGE AGAINST CIVIL COURTHOUSE ARRESTS HAS UNDERMINED COURT OPERATIONS AND ACCESS TO JUSTICE.

The stakes of abandoning the civil courthouse arrest privilege are not hypothetical. The
explosion of civil arrests by ICE during Operation Midway Blitz and Operation at Large, its Border
Patrol counterpart, highlight the egregious risks to Illinois' justice system that the privilege was
meant to prevent—and which CASPA is meant to guard against. While civil immigration arrests
at courthouses in 2025 may have prompted the General Assembly to act, the law protects against
the same harms that would arise if any federal, state or local law enforcement undertook to arrest
people over civil matters while going to, returning from, or attending court.

### A.     DHS' Prior Approach to Courthouse Arrests.

Immigration arrests are part of a "civil" legal process covered by the common law
privilege. It is generally not a crime for a removable immigrant to remain present in the country.
*Arizona v. United State*s, 567 U.S. 387, 396, 407 (2012). Deportation proceedings are in turn
"purely civil action[s] to determine eligibility to remain in this country, not to punish unlawful
entry." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

Federal immigration authorities conduct civil arrests to pursue these civil deportation
proceedings. Under the Immigration and Nationality Act (INA), a person may be arrested on an

---

[3] *See ICE Arrests Threaten to Chill Access to Justice*, ILL. CTS. (Aug. 28, 2017),
https://www.illinoiscourts.gov/News/855/ICE-Arrests-Threaten-to-Chill-Access-to-Justice/news-detail/.
[4] *Id.*

administrative warrant "pending a decision on whether the alien is to be removed" or where an existing final administrative order already exists. 8 U.S.C. § 1226(a); 8 CFR § 241.2(a)(1). Such warrants are issued by a DHS officer, not by an Article III judge or neutral magistrate. 8 CFR § 241.2(a)(1); *Aguilar v. U.S. Immigr. & Customs Enf't Chicago Field Office*, 346 F. Supp. 3d 1174, 1188-89 (N.D. Ill. 2018). Immigration officers may also arrest a person without a warrant if the officer has probable cause to believe that they are "in the United States in violation of" laws "regulating the admission, exclusion, expulsion, or removal of aliens" but only if there is also probable cause that the person "is likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2); *Castañon Nava v. Dep't of Homeland Security*, 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020).

Consistent with the common law privilege, prior presidential administrations severely restricted courthouse immigration arrests, with a limited exception during part of the first Trump Administration.[5] Under a 2021 Department of Homeland Security (DHS) Memorandum, ICE agents were not permitted to conduct "civil immigration enforcement action . . . in or near a courthouse" except in extremely limited circumstances, including on basis of "a national security threat," "an imminent risk of death, violence, or physical harm to any person," the "hot pursuit of an individual who poses a threat to public safety," or the "imminent risk of destruction of evidence material to a criminal case." Immigration Enforcement in or near Courthouses 2 (Apr. 2021).[6] The DHS Memorandum cautioned that "[e]xecuting civil immigration enforcement actions in or near

---

[5] *See* U.S. Immigration & Customs Enforcement, Directive No. 11072.1, Civil Immigration Actions Inside Courthouses (Jan. 10, 2018), https://perma.cc/JY9J-2FUX.
[6] Memorandum from Tae Johnson, Acting Dir. of U.S. Immigr. and Customs Enf't & Troy Miller, Acting Comm'r of U.S. Customs and Border Prot., on Civil Immigr. Enf't Actions in or near Courthouses to ICE & CBP (Apr. 27, 2021), https://perma.cc/KJJ2-7JNW.

a courthouse may chill individuals' access to courthouses, and as a result, impair the fair administration of justice." *Id*. at 1.

Similarly, in 2023, the Executive Office of Immigration Review (EOIR) issued its own Operating Policies and Procedures Memorandum (OPPM) 23-01, which adopted the principles and policies in the 2021 DHS Memorandum. Enforcement Actions in or Near OCIJ (Office of the Chief Immigration Judge) (Dec. 2023).[7] The EOIR policy prohibited immigration enforcement near immigration court, which includes its entrance, exit, parking lot, and close transportation points. *Id.* at 1 ("'Near' OCIJ space means in the close vicinity of OCIJ space, including the entrance and exit of the building in which OCIJ conducts business, as well as adjoining or related areas such as adjacent parking lots or transportation points (e.g., a bus stop directly outside of the building).").

### B.    DHS' Sudden Decision to Widely Disregard the Common Law Privilege Against Courthouse Arrest.

The Trump administration drastically changed course in 2025, issuing an ICE memorandum that permits immigration arrests at courthouses as part of its larger effort to ramp up immigration enforcement. *See* Civil Immigration Enforcement Actions In or Near Courthouses (May 2025) ("ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location.").[8] The policy does not just allow civil arrests of non-citizens who are specifically targeted by ICE, but also "family members or friends accompanying

---

[7] Memorandum from Sheily McNulty, Chief Immigr. Judge, on Operating Pol'ys and Procs. Memorandum 23-01: Enf't Actions in or Near OCIJ Space to All Assistant Chief Immigr. Judges, Immigr. Judges, Court Adm'rs, and Court Person. (Dec. 11, 2023), https://perma.cc/5J3Z-Q5ZZ.

[8] Memorandum from Todd M. Lyons, Acting Dir. of ICE on Civil Immigr. Enf't
Actions In or Near Courthouses to All ICE Emps. 2 (May 27, 2025), https://perma.cc/94F8-QGXG; *see also* Hamed Aleaziz et al., *How ICE is Seeking to Ramp up Deportations through Courthouse Arrests*, N.Y. TIMES (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

the target alien" and even non-citizens "serving as a witness in a proceeding." *Id.* The guidance omits any reference to the policy rationales that prevented the federal government from conducting such actions in the past, including the risk of impeding access to the court system. Instead, the purpose of the current policy is to enhance the federal government's civil immigration enforcement power, particularly in jurisdictions that "refuse to cooperate with ICE." *Id.* at 1.

C.    **Immigration Arrests at Courthouses in Northern Illinois Created a Severe Chilling Effect on Court Operations, Undermined the Administration of Justice, and Harmed *Amici*'s Clients.**

After the new policy described above went into effect, there was a chilling effect on court operations throughout Chicago, Cook County, and suburban counties in northeastern Illinois. Within a week of its implementation, the administration launched "enhanced targeted operations" of the Chicago area that resulted in hundreds of immigration arrests.[9] The administration's targeting of Chicago escalated with the launching of "Operation Midway Blitz" on September 8, 2025.[10] These operations caused widespread fear in immigrant communities across the Chicago area: People stopped going to work, missed doctor appointments, and stopped walking their children to school.[11] The operation continued for months, with a significant number of immigrants stopped, questioned, and arrested every day by ICE—including in and around courthouses.[12]

---

[9] Priscilla Alvarez & Rosa Flores, *Trump administration launches nationwide immigration enforcement blitz*, CNN (Jan. 27, 2025), https://www.cnn.com/2025/01/26/politics/chicago-immigration-trump-ice/index.html; Craig Wall and Lissette Nuñez, *Mayor reaffirms Chicago's welcoming city status amid ICE raids; at least 100 arrested in area*, ABC7 CHI. (Jan. 28, 2025), https://abc7chicago.com/post/ice-chicago-immigration-raids-today-arrests-continue-mayor-brandon-johnson-called-testify-sanctuary-city-policy/15843173/.

[10] Rebecca Santana, *ICE arrests nearly 550 in Chicago area as part of 'Midway Blitz'*, AP NEWS (Sep. 19, 2025), https://apnews.com/article/trump-immigration-deportation-ice-chicago-arrests-a09921fedd10489f08a4073abe31345e.

[11] Nader Issa, *What to know about Trump's immigration enforcement campaign in Chicago*, WBEZ (Sep. 24, 2025), https://www.wbez.org/immigration/2025/09/24/chicago-immigration-president-donald-trump-dhs-ice; Kristen Schorsch, *Amid deportation fears, hundreds of patients skip appointments at one Chicago health clinic*, WBEZ (Feb. 5, 2025), https://www.wbez.org/2025/02/05/amid-deportation-fears-hundreds-of-patients-skip-appointments-at-one-chicago-health-clinic.

[12] *See, e.g.*, Rebecca Santana, *ICE denies using excessive force as it broadens immigration arrests in Chicago*, AP NEWS (Sep. 20, 2025), https://apnews.com/article/trump-immigration-deportation-ice-chicago-arrest-fd6d049fcd293b62f85ffcd5b1a547ee; Michelle Gallardo and Tre Ward, *Tamale vendor among several arrested*

10

Courthouse operations across Cook County were significantly and negatively impacted by ICE's enforcement. *Amici* have each been affected by the aggressive, unlawful conduct in the past year as immigration officers deliberately violated countless individuals' privilege against civil courthouse arrest.

Beginning in early 2025, employees of the Law Office of the Cook County Public Defender observed ICE agents in and around Cook County courts.[13] Public defender employees likewise noticed that ICE's presence significantly increased during the month of September 2025, after the Trump Administration launched "Operation Midway Blitz."[14] For example, during the first three weeks of September 2025, ICE agents entered courthouses in at least four separate locations: the Daley Center, the Leighton Criminal Court Building, the Domestic Violence Courthouse, and the branch courts at 111th Street. In each location, ICE agents arrested people attempting to attend their civil or criminal court hearings. For example:

      a.      On September 23, 2025, at the Branch 38 courthouse located on 111th Street in Chicago, ICE agents detained and arrested a public defender client as they were attempting to enter the courthouse.

---

*during ICE raid near Home Depot on SW Side: 'Took everything'*, ABC7 CHI. (Sep. 25, 2025), https://abc7chicago.com/post/ice-chicago-operation-midway-blitz-agents-arrest-several-people-2-home-depot-stores-southwest-side-city/17882529/; Madeline Buckley & William Tong, *ICE agents detain 2 at county domestic violence courthouse this week. Advocates warn of chilling effect on victims.*, CHI. TRIB. (Sep. 4, 2025), https://www.chicagotribune.com/2025/09/04/immigration-domestic-violence-court/.

[13] As part of their legal representation, public defender employees staff courthouses throughout the City of Chicago, including at the Leighton Criminal Court building located at 26th Street and California Avenue, branch courts located at 111th Street, Grand and Central, Harrison and Kedzie, the Domestic Violence Courthouse located at 555 W. Harrison, and in Traffic Court located in downtown Chicago at the Daley Center. They also staff suburban Cook County courthouses in Skokie, Maywood, Markham, Bridgeview, and Rolling Meadows.

[14] Sophia Tareen, *Activists say immigration enforcement increased as Chicago waits for promised federal intervention*, AP NEWS (Sep. 15, 2025), https://apnews.com/article/immigration-trump-chicago-arrests-4e4ded644704ccb6ba853bda3be7c4d1.

11

b.     On September 15, 2025, at the Domestic Violence court located at 555 W. Harrison in Chicago, a branded ICE SUV vehicle was parked prominently outside of the front of the courthouse.[15]

c.     On September 3, 2025, at the Domestic Violence court located at 555 W. Harrison in Chicago, a woman was arrested by ICE agents as she was attempting to attend a hearing in her misdemeanor case.[16]

d.     On September 2, 2025, at the Domestic Violence court located at 555 W. Harrison in Chicago, a man was detained and arrested outside of the courthouse building after attending his court hearing.[17]

e.     On July 24, 2025, at the suburban Maywood courthouse, a man was taken into custody by plainclothes ICE agents inside the courthouse after he left his court hearing. The agents never showed a warrant or identified themselves during the arrest.[18]

In addition to entering Cook County court and arresting people at and around the courthouses, Public Defender employees noted that ICE agents were parking their vehicles in prominent positions outside of court facilities. This struck fear into immigrants attending court and harmed their trust in the legal system.[19] Likewise, defense attorneys in suburban Cook County courthouses reported that their immigrant clients "are very hesitant to come to court even for minor

---

[15] *See* Mitchell Armentrout & Sophie Sherry, *Federal agents make immigration arrests in West Chicago and at West Side courthouse*, CHI. SUN-TIMES (Sep. 15, 2025), https://chicago.suntimes.com/immigration/2025/09/15/ice-west-chicago-arrests-federal-agents-immigration.

[16] Sabrina Franza, *ICE agents detain woman at Domestic Violence Courthouse in Chicago, witnesses say*, CBS NEWS (Sep. 3, 2025), https://www.cbsnews.com/chicago/news/ice-agents-detain-woman-domestic-violence-courthouse.

[17] Buckley & Tong, *supra* note 12.

[18] Kade Heather, *ICE arrests person without warrant at Maywood Courthouse, coalition says*, CHI. SUN-TIMES (July 24, 2025), https://chicago.suntimes.com/immigration/2025/07/24/ice-arrests-person-without-warrant-at-maywood-courthouse-coalition-says.

[19] Ben Bradley, *Here's how ICE agents operate at courthouses, inside jails*, WGNTV (Sep. 9, 2025), https://wgntv.com/news/wgn-investigates/video-heres-how-ice-agents-operate-at-courthouses-jails/.

traffic matters."[20] *Amicus* Cabrini Green Legal Aid, which also practices indigent criminal defense, has voiced apprehension about the chilling effect that ICE activity has had in Cook County courthouses. The legitimate fears its clients have experienced undermine its clients' trust in the justice system and hamper its ability to be zealous advocates for the communities it serves.

In neighboring Lake County, State's Attorney Eric Rinehart reported a number of cases where victims, witnesses, or family members were reluctant to appear in court. State's Attorney Rinehart remarked: "When ICE or others discourage victims from appearing in court, our community is less safe because we cannot win trials without victims. When victims are too scared to call the police or testify in court, dangerous offenders (of all backgrounds) go free."[21]

*Amici*'s concerns extend well beyond the purview of criminal law. Civil legal services organizations in Illinois are deeply troubled by law enforcement activities in and around courthouses. They serve clients who have had to forgo participation in court proceedings out of fear of being harassed, detained, and arrested by ICE at or near county courthouse buildings.

Domestic violence survivors and their advocates have borne some of the worst brunt of ICE's conduct. Advocacy organizations for victims of domestic violence report that immigrant victims of domestic violence fear calling the police, filing for orders of protection, and appearing in court.[22]

Victims of domestic violence were deterred from coming to the Domestic Violence Courthouse in Cook County due to ICE's presence.[23] In one example, after ICE agents arrested a

---

[20] Barbara Vitello, *'A chilling effect on justice'? ICE argues courthouse immigration arrests make sense, but local opponents fear impact*, DAILY HERALD (Aug. 2, 2025), https://www.dailyherald.com/20250802/news/a-chilling-effect-on-justice-ice-argues-courthouse-immigration-arrests-make-sense-but-local-oppo/.
[21] *Id.*
[22] *Media Release: AIS Condemns ICE Actions at Chicago Courthouse*, ALLIANCE FOR IMMIGRANT SURVIVORS (Sep. 8, 2025), https://www.immigrantsurvivors.org/media-release-ais-condemns-ice-actions-at-chicago-courthouse.
[23] Franza, *supra* note 16.

woman at that courthouse, victim advocates feared that people would "need to choose between reporting domestic violence and facing ICE when they show up to court."[24] ICE's presence at the domestic violence courthouse was "an affront to all the work this country has done over the last 40 years to ensure that victims of domestic violence and sexual assault have access to justice."[25]

*Amicus* Illinois Coalition Against Domestic Violence, whose member organizations serve people in all 102 Illinois counties, has received reports from its member programs of numerous incidents of domestic violence victims reluctant to reach out to law enforcement or seek legal action against their abusers because of ICE presence in their communities, in or at courthouses. This is especially to concerning to ICADV because domestic violence homicides have increased in Illinois in recent years, and the legal system is an important tool for preventing further domestic abuse. As a statewide coalition, ICADV is committed to removing barriers for victims seeking legal relief to prevent further abuse.

Many clients of *amicus* Life Span dropped requests for a civil order of protection out of fear of harassment by federal immigration agents and stopped participating in related criminal cases against abusers. In one instance, a client refused to proceed with a divorce prove-up hearing that could have gotten the client child support. *Amicus* Chicago Alliance Against Sexual Exploitation reported its clients have expressed fear of attending civil protective order proceedings and testifying as sexual assault victims in criminal court due to immigration concerns. A client of *amicus* Legal Aid Society of Metropolitan Family Services declined to participate in her abuser's prosecution for the same reason. Both clients and staff members of *amicus* Ascend Justice were fearful of attending court in person and the organization found that unrepresented survivors sometimes opted to simply abandon pending cases.

---

[24] *Id.*
[25] Buckley & Tong, *supra* note 12.

14

*Amicus* Family Rescue likewise had a survivor client decline to appear as a witness in her abuser's criminal trial for fear of interacting with immigration enforcement, and the charges were dismissed. As Family Rescue observes, the intersection of immigration enforcement and domestic violence is complex. Survivors who want justice for the harm done to them may still not want their abusers deported, so survivors afraid of immigration enforcement at the courthouse may reconsider bringing criminal charges against their abusers. That climate of fear creates additional barriers for survivors and may eliminate the legal system as a tool for survivors to leave abusive relationships.

*Amicus* Mujeres Latinas en Acción also reported that survivors and their families expressed a fear of engaging with the court system due to the threat of ICE. The organization found that the presence of ICE at courthouses and shelters, spaces where survivors and their families are following the law and desperately seeking a sense of safety, resulted in survivors retreating further into silence—and danger. Survivors were increasingly afraid to seek orders of protection, appear in court, or call the police when they or their children were at risk.

Legal advocates at *amicus* Apna Gar, like other organizations, were forced to shift their focus to address these new threats, as perpetrators began leveraging ICE involvement to intimidate and control survivors. ICE's presence at courthouses created additional challenges when planning for court hearings, including requiring attempts to shift in-person appointments to virtual ones— efforts that occasionally succeeded but more often led to increased stress and trauma for survivors.

Clients outside the domestic violence context have likewise suffered during this period. For example, *amicus* James B. Moran Center for Youth Advocacy has many clients in mixed-status households. In one case, a client declined to appear at the Skokie Courthouse to serve as a witness in a traffic matter out of fears of harassment by immigration agents. The Moran Center's social workers and attorneys have reported other instances in which clients or their families have been hesitant or have outright refused to attend court due to concerns about ICE activity.

15

*Amicus* Westside Justice Center has witnessed the climate of fear that ICE's enforcement tactics have created in the communities it serves. WJC is concerned that ICE's presence at courthouses adds one more obstacle in the face of marginalized communities and undermines their trust in our system of justice.

*Amicus* Law Center for Better Housing has observed the effect of ICE's presence in the context of its advocacy for renters. In the past months, LCBH has had several cases involving landlords threatening to call ICE to intimidate immigrant tenants or tenants perceived to be immigrants, in direct violation of Illinois's Immigrant Tenant Protection Act. LCBH's clients have been reticent to raise these claims for fear of further retaliation. The presence of ICE agents at courthouses compounds their fears and makes them less likely to participate in their cases, which leads to an increase in eviction orders and housing instability for their families and communities.

Similarly, *amicus* Legal Action Chicago's partner organizations and their attorneys have reported situations in which individuals avoided hearings or failed to seek legal relief because of concerns about ICE activity. In one example, a mother pursued emergency civil relief for her 12-year-old daughter, an alleged victim of sexual assault, but was unable to find family members to come to court to accompany the minor daughter while she attended the hearing, because the family was concerned about ICE's notable presence at that courthouse outside of Cook County. In another instance, attorneys from a civil legal aid agency outside of Cook County witnessed, alongside their client, an arrest at gunpoint outside the courthouse. This had a chilling effect that discouraged the client from pursuing important legal relief when they needed it.

The widespread harm to the judicial system caused by DHS's enforcement practices in the fall of 2025 led former Cook County Circuit Court Chief Judge Evans to issue a General Order, weeks prior to CASPA's passage by the General Assembly, re-affirming the privilege against civil

16

courthouse arrests.[26] It was supported by other local officials who condemned the ongoing disruptions to court operations.[27] CASPA extends statewide the protections that were re-affirmed by that Order.

### III.  CASPA IS A LEGITIMATE EXERCISE OF THE STATE'S PREROGATIVE TO PROTECT ITS COURT SYSTEM AND THE PEOPLE THAT IT SERVES.

CASPA is consistent with the longstanding state prerogative to regulate its own court systems and procedures. *See Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970) ("One of the reserved powers [to the States] was the maintenance of state judicial systems for the decision of legal controversies."); *Brown v. New Jersey*, 175 U.S. 172, 175 (1899) ("The state has full control over the procedure in its courts, both in civil and criminal cases, subject only to the qualification that such procedure must not work a denial of fundamental rights, or conflict with specific and applicable provisions of the Federal Constitution."); *see also Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 30 (1st Cir. 2020) ("[T]he operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty.").  It recognizes the specific needs of the courts on the ground in the State of Illinois.

To this end, CASPA has provided needed clarity on the nature and scope of the common law courthouse arrest privilege in Illinois in the face of a ramp-up in immigration enforcement during Operation Midway Blitz. Since it became effective on December 9, 2025, reported courthouse arrests in Illinois plummeted, making it much safer for litigants to appear, for witnesses to travel to court, for women and families to seek the services they need, for tenants to seek the protections from eviction they require, for legal personnel to do their jobs unhindered and without

---

[26] Cook County Cir. Ct. Gen. Admin. Order 2025-10, Common Law Privilege Against Civil Arrests for Attending Court (Oct. 14, 2025), https://ocj-web-files.s3.us-east-2.amazonaws.com/orders/GAO_2025-10.pdf?VersionId=atjFosyslX95ZiwwSl9UeuDOeS0gB7x6.

[27] Kade Heather, *Preckwinkle Calls on Chief Judge to Ban ICE Arrests at Cook County Courthouses,* CHI. SUN-TIMES (Oct. 9, 2025), https://chicago.suntimes.com/immigration/2025/10/09/preckwinkle-calls-on-chief-judge-to-ban-ice-arrests-at-cook-county-courthouses.

fear, and for the judiciary to maintain control over its courtrooms. While the harm caused by the actions of Plaintiff's immigration agents in 2025 continues to impact *Amici* and their client populations, as well as witnesses, family members, and other legal staff and personnel, CASPA has served as an overwhelmingly positive step towards ensuring the privilege against civil arrest is protected.

As now-former Chief Judge of the Circuit Court of Cook County Timothy C. Evans wrote in issuing the General Order on the privilege on October 14, 2025:

> Access to justice depends on every individual's ability to appear in court without fear or obstruction. Our courthouses remain places where all people—regardless of their background or circumstance—should be able to safely and confidently participate in the judicial process.[28]

CASPA has done so while still protecting the ability of law enforcement to do their jobs. The statute does not bar criminal arrests, probation violation arrests, nor civil arrests outside of the statute's court-specific limits. CASPA only regulates conduct that has been unlawful since at least the age of Blackstone. *N.Y. v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 392 (S.D.N.Y. 2019); 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768).

The Complaint asks this Court to draw an inference contrary to the lived reality of *Amici* and their clients: that civil courthouse arrests somehow *enhance* public safety. Dkt. 1 ¶¶ 70, 78-79. These conclusory allegations are belied by centuries' worth of case law, from the U.S. Supreme Court down, recognizing that such arrests only serve to degrade the functioning of courts.[29] In fact,

---

[28] Press Release, Cir. Ct. of Cook County, *Chief Judge Evans Addresses Legal Protection for Individuals Attending Court Proceedings*, (Oct. 14, 2025), *available at* https://www.cookcountycourtil.gov/news/chief-judge-evans-addresses-legal-protection-individuals-attending-court-proceedings#:~:text=Chief%20Judge%20Timothy%20C.,court%20proceedings%20in%20Cook%20County; *see also* Cook County Cir. Ct. Gen. Admin. Order 2025-10, Common Law Privilege Against Civil Arrests for Attending Court (Oct. 14, 2025), https://ocj-web-files.s3.us-east-2.amazonaws.com/orders/GAO_2025-10.pdf?VersionId=atjFosyslX95ZiwwSl9UeuDOeS0gB7x6.

[29] *Stewart*, 242 U.S. at 129; *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923); *Williamson v. United States*, 207 U.S. 425, 443 (1908); *Long v. Ansell*, 293 U.S. 76, 83 (1934); *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Greer*, 11 N.E.

it is civil arrests at courthouses that pose the threat to public safety and the rule of law, as demonstrated by the recent experience of *Amici* and others, described here. Derailing criminal trials, discouraging domestic violence survivors from seeking orders of protection, and otherwise making it harder for the public to rely on and trust the court system makes all of us less safe.

## CONCLUSION

Civil arrests in and around Illinois courthouses strike at the heart of justice itself. They drive survivors to choose between seeking help and staying silent, drive witnesses into hiding, derail prosecutions, and erode public trust in the courts. For more than a century, Illinois protected those who enter its courthouses from civil arrest to ensure that justice may proceed unimpeded. CASPA simply codified that longstanding protection.

To preserve access, safeguard due process, and defend the integrity of the state's judicial proceedings, *Amici* request that this Court grant Illinois' Motion to Dismiss as to CASPA.

> Respectfully submitted,
>
> Apna Ghar, Ascend Justice, the Chicago Alliance Against Sexual Exploitation, Cabrini Green Legal Aid, Family Rescue, the Illinois Coalition Against Domestic Violence, the Illinois Coalition for Immigrant and Refugee Rights, the James B. Moran Center for Youth Advocacy, the Law Center for Better Housing, the Law Office of the Cook County Public Defender, Legal Action Chicago, Legal Aid Society of Metropolitan Family Services, Life Span, Mujeres Latinas en Acción, The Network, and Westside Justice Center,
>
> as *Amici Curiae*

---

at 169; *Meekins*, (1791) 126 Eng. Rep. 363; *Cole*, (1738) 95 Eng. Rep. 396; *Jones*, 189 N.E.2d at 37; *Wangler*, 41 N.J. at 280-81; *Doe*, 490 F. Supp. 3d at 690; *United States. v. N.Y.*, No. 1:25-cv-744 (MAD/PJE), 2025 WL 3205011, at *11 (N.D.N.Y. Nov. 17, 2025); *N.Y.*, 431 F. Supp. at 392; *Wash. v. U.S. Dep't of Homeland Security*, 614 F. Supp. 3d 863, 879, 879 n.21 (W.D. Wash. 2020).

19

Dated: March 2, 2026

/s/Daniel J. Schneider
Daniel Schneider
LEGAL ACTION CHICAGO
200 N. LaSalle St., Suite 1540
Chicago, IL 60601
(312) 341-1070
dschneider@legalactionchicago.org

/s/Alexa Van Brunt
Alexa Van Brunt
Noor Tarabishy
Jonathan Manes
MACARTHUR JUSTICE CENTER
160 East Grand Ave, 6th Floor
Chicago, IL 60611
(312) 503-1336
alexa.vanbrunt@macarthurjustice.org

**Counsel for Amici Curiae**

/s/Sharone R. Mitchell, Jr.
Sharone R. Mitchell, Jr.
Public Defender of Cook County
Law Office of the Cook County Public Defender
69 West Washington Street
Suite 1600
Chicago, IL 60602

**Counsel for the Law Office of the Cook County
Public Defender**