**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

THE UNITED STATES OF AMERICA,

      Plaintiff,

      v.

STATE OF ILLINOIS; JB PRITZKER,
Governor of Illinois, in his Official Capacity;
KWAME RAOUL, Attorney General of
Illinois, in his Official Capacity,

      Defendants.

Case No. 3:25-cv-02220-DWD

Honorable David W. Dugan

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.    The Illinois Bivens Act ......................................................................................... 2

    II.    The Court Access, Safety, and Participation Act (CASPA) ............................... 2

    III.   Procedural History ............................................................................................... 3

LEGAL STANDARDS ................................................................................................. 4

ARGUMENT ................................................................................................................. 4

    I.    The United States Has Standing to Protect its Sovereign Interests from Injury Caused by Illinois' Unconstitutional State Laws................................................................ 4

        A.    The United States Has Standing Because This Court can Redress the Injuries Caused by the Illinois Bivens Act and the CASPA ............................... 5

            1.    Enjoining Defendants From Enforcing the Illinois Bivens Act or Declaring the Law Unconstitutional Would Provide Redress ................................... 5

            2.    The United States Has Standing to Challenge the CASPA as Judges Issuing Orders Preventing Courthouse Arrests Are Sufficiently Adverse to the Federal Government ........................................................................ 10

        B.    The United States Plausibly Alleges Pre-Enforcement Standing ......................... 13

    II.    The Complaint Sufficiently Pled Claims of Unlawful Regulation and Discrimination ... 15

        A.    Illinois Does Not Contest that the Illinois Bivens Act Unlawfully Regulates and Discriminates Against the United States.................................................. 15

        B.    The United States Sufficiently Pled a Claim of Unlawful Regulation as to the CASPA........................................................................................................ 15

        C.    Federal Law Does Not Incorporate a Privilege Against Courthouse Arrests ....... 16

        D.    Illinois' Alternative Proprietor Argument is Unavailing ..................................... 20

CONCLUSION.............................................................................................................. 20

**INTRODUCTION**

Bedrock constitutional principles provide for a system of dual sovereignty. Under that system, while States may govern legitimate areas of local concern, they may not do so in a manner that regulates or discriminates against the Federal Government. Yet, the State of Illinois, through the enactment of the Illinois Bivens Act and the Court Access, Safety, and Participation Act ("CASPA"), seeks to do both. By creating a state-sanctioned private cause of action and by enacting a broad prohibition on how and where federal officers may make civil arrests, Illinois has run afoul of the Supremacy Clause. *See M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (States have no power to "in any manner control[] the operations of" the Federal Government.). These Acts violate the intergovernmental immunity doctrine by "regulat[ing] the United States directly or discriminat[ing] against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion).

Notwithstanding that the United States' Complaint sufficiently pleads these violations, Compl. ¶¶ 80-93, ECF No. 1, Illinois moves to dismiss this action for lack of standing and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (b)(6). Specifically, Illinois contends that the Federal Government cannot bring a pre-enforcement challenge to its Bivens Act and the CASPA against the named defendants and that the CASPA is not an unlawful regulation because it incorporates the common law privilege against courthouse arrests to which federal immigration officers are already subject.  Both arguments fail.

The requested injunction and declaratory judgment against Illinois and its officers clearly would redress the alleged sovereign injury to the United States, including federal officers who are exposed to civil liability through the Illinois Bivens Act and the CASPA—injuries Illinois does not dispute exist. That is more than sufficient for the Illinois Bivens Act challenge to withstand dismissal on standing. The CASPA challenge likewise withstands dismissal on standing as well as the merits because it unlawfully regulates the Federal Government's performance of immigration

1

functions, and no common law privilege—whatever its scope—entitles Illinois to regulate the Federal Government. But in any event, the privilege is not incorporated into the Immigration and Nationality Act ("INA"), and the CASPA is more expansive than that privilege anyway.

Because Illinois' motion is insubstantial, this action should proceed.

## BACKGROUND

### I.  The Illinois Bivens Act

The Illinois Bivens Act provides a cause of action against "any person who, while conducting civil immigration enforcement, knowingly engages in conduct that violates the Illinois Constitution or the United States Constitution." 740 ILCS 16/5-10 (2025). The Act also provides that "[a]ll monetary, injunctive, and declaratory relief available at common law is available under this Act for a violation of this Act without regard to whether a plaintiff may have a claim under any other statute or common law cause of action." *Id*. 16/5-15(a). Moreover, the Act authorizes punitive damages if the law enforcement officer: (1) "wore a facial covering while committing the violation;" (2) "failed to identify or disclose that he or she was a law enforcement officer either verbally or by wearing identifying insignia;" (3) failed "to wear and use an officer-worn body camera" if required by state or federal law, regulation, or agency policy; (4) operated or used a "motor vehicle without a license plate or with a non-Illinois license plate;" (5) "used crowd control equipment[;]" or (6) "intentionally violated or failed to comply with any material term or condition of a court order or consent decree[.]" *Id*. 16/5-15(a)(1-6).

### II.  The Court Access, Safety, and Participation Act (CASPA)

The CASPA provides that "[a] person duly and in good faith attending a State court proceeding in which the person is a party, a witness, a potential witness, or a court companion of a party, witness, or potential witness is privileged from civil arrest while going to, remaining at, and returning from the court proceeding." 705 ILCS 96/10-15(a) (2025). The statute prohibits civil arrests in locations including, "(1) at the place of the court proceedings; (2) within the courthouse

2

building; (3) on the premises of the courthouse, including parking facilities serving the courthouse; (4) on any sidewalk, parkway, and street surrounding the courthouse and its premises; and (5) on any public way within 1,000 feet of the courthouse including a sidewalk, parkway, or street." *Id*. 96/10-15(a)(1-5). The CASPA broadly defines "[c]ourt companion" as "any of the following individuals whose purpose is to support, assist, or accompany a person who is going to, remaining at, or returning from a court proceeding:"

> a spouse, domestic partner, or person who has a dating or engagement relationship with the party, witness, or potential witness; a biological parent, foster parent, adoptive parent, or stepparent of a party, witness, or potential witness; minor children or other persons under the care of a party, witness, or potential witness; interpreters; translators; a person assisting the party, witness, or potential witness with reading or completing court forms or other documents; persons providing health care or assistance to a party, witness, or potential witness to allow that individual to participate in the court proceeding; a case manager or social worker for the party, witness, or potential witness; a domestic violence or sexual assault advocate; a person transporting a party, witness, or potential witness to or from the court proceeding.

705 ILCS 96/10-10 (2025).

An officer who willfully arrests someone in violation of the CASPA or a court order under Section 10-20 is liable for "false imprisonment, including actual damages and statutory damages of $10,000, if that person knew or reasonably should have known that the person arrested is a [covered person under CASPA]." 705 ILCS 96/10-25(a). Other available remedies include "equitable or declaratory relief" and costs and reasonable attorney's fees. *Id*. 96/10-25(b).

## III.    Procedural History

The United States filed this action on December 22, 2025, against Defendants the State of Illinois and Illinois Governor JB Pritzker and Illinois Attorney General Kwame Raoul, in their official capacities. The Complaint raises two claims under the Supremacy Clause: that the Illinois Bivens Act and the CASPA unlawfully regulate the Federal Government (Count I); and that the Illinois Bivens Act unlawfully discriminates against the Federal Government (Count II). *See* Compl. ¶¶ 80-93. The United States seeks declaratory and injunctive relief preventing Illinois from

enforcing the challenged laws. *See id*., Prayer for Relief ¶¶ 1-4. On February 23, 2026, Illinois moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Motion to Dismiss, ECF No. 8 ("Mot."). In that motion, Illinois challenges the Government's standing as to both the Illinois Bivens Act and the CASPA but only challenges the latter for failure to state a claim. *See generally* Mot. The United States now opposes that motion.

## LEGAL STANDARDS

Motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "are meant to test the sufficiency of the complaint, not to decide the merits of the case." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). To withstand dismissal under Rule 12(b)(6) for failure to state a claim, a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), a court shall draw all reasonable inferences and facts in the light most favorable to the nonmoving party. *See Jett v. Warrantech Corp.*, 436 F. Supp. 3d 1170, 1176 (S.D. Ill. 2020) (citing *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014)).

## ARGUMENT

**I.     The United States Has Standing To Protect its Sovereign Interests from Injury Caused by Illinois' Unconstitutional State Laws**

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The United States satisfies these elements for each claim. Notably, Illinois does not dispute that the United States has plausibly pled a cognizable injury. *See* Mot. at 7 ("But, as explained, injury alone does not establish standing . . ."). The lion's share of Illinois' standing

4

arguments are predicated on the redressability element of standing. Specifically, Illinois contends that "enjoining any of these [named] defendants' enforcement of the Bivens Act will not relieve the federal government of its asserted injury[,]" *id*. at 7, because "there aren't any Illinois officials who enforce the Bivens Act," *id*. at 8. Likewise, for the CASPA, Illinois claims that "the federal government is not adverse to the Illinois judges who are authorized to enter these orders [preventing courthouse arrests] and therefore lacks Article III standing to maintain this pre-enforcement challenge to the statute." *Id*. at 13. Finally, in passing, Illinois suggests that the Federal Government lacks standing to bring a pre-enforcement challenge to the Bivens Act. *Id*. at 6. None of Illinois' arguments has any merit.

**A.      The United States Has Standing Because This Court Can Redress the Injuries Caused by the Illinois Bivens Act and the CASPA**

**1.      Enjoining Defendants From Enforcing the Illinois Bivens Act or Declaring the Law Unconstitutional Would Provide Redress**

This Court should reject Illinois' arguments that the United States lacks standing to challenge the Illinois Bivens Act based on its assertion that there are no Illinois officials who enforce it. As an initial matter, as alleged in the Complaint and not controverted by Illinois, the State's "creation of a cause of action itself is a regulatory action." Compl. ¶ 53. The Federal Government is harmed thereby "because the mere threat of a suit, its proceedings, and eventual liability can chill the zealous enforcement of federal law." *Id.* ¶ 54. That is doubly true given the existence of punitive damages to deter specific conduct, such as wearing masks. *Id.* ¶ 61. Moreover, as the United States has alleged, Congress, not individual states, is better positioned to understand the ramifications a new cause of action may have on individual federal agents and the Government as a whole. *See id.* ¶¶ 33, 52. Inherent in that analysis are the harms stemming from the needed resource allocation to defend such causes of action, including attorney time and attendant litigation costs. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994) ("We leave it to Congress to weigh the implications of such a significant expansion of Government liability."). The

Federal Government has standing to seek redress for those injuries caused by the named Defendants.

Illinois ignores that standing basis and instead posits that the Illinois Bivens Act is analogous to S.B. 8, the Texas law challenged in *Whole Woman's Health v. Jackson*, Mot. at 9-10, which created an exclusively private cause of action for "statutory damages awards against those who perform or assist prohibited abortions." 595 U.S. 30, 36 (2021). Pertinently, the Supreme Court held that state judges and court clerks are not proper defendants for purposes of enjoining the enforcement of S.B. 8. *See id.* at 39-40. Illinois, therefore, claims that "[t]he only Illinois officials who will have anything to do with the Bivens Act are the judges tasked with adjudicating the claims that private parties may choose to bring under its authority." Mot. at 9.

Illinois' reliance on *Whole Woman's Health* is misplaced. Unlike the Illinois Bivens Act, which allows "any person" to bring these civil actions against a federal agent "conducting civil immigration enforcement," 740 ILCS 16/5-10, S.B. 8 explicitly deprived any state or local official of its enforcement authority. *See Whole Woman's Health*, 595 U.S. at 35-36 ("[T]he law generally does not allow state officials to bring criminal prosecutions or civil enforcement actions. Instead, S.B.8 directs enforcement 'through *private civil actions*.'" (emphasis added)); Tex. Health & Safety Code Ann. § 171.207(a) ("Notwithstanding . . . any other law, the requirements of this subchapter shall be enforced exclusively through . . . private civil actions."); *id.* § 171.208(a) ("Any person, *other than an officer or employee of a state or local governmental entity in this state*, may bring a civil action[.]" (emphasis added)). In other words, whereas S.B. 8 conspicuously directs enforcement substantially through private suits, nothing on the face of the Bivens Act prevents any state official from bringing these civil actions on behalf of the State of Illinois. *Cf. Ball v. Madigan*, 245 F. Supp. 3d 1004, 1017 (N.D. Ill. 2017) ("Illinois law provides the Attorney General with broad authority 'to institute and prosecute all actions and proceedings in favor of or for the use of the State . . .'"). Thus, unlike the challengers in *Whole Woman's Health*, *see* 595

U.S. at 38-40, the United States is not relying on state judges and court clerks to establish redressability, as Illinois would have it.

Accordingly, contrary to Illinois' arguments, Governor Pritzker, Attorney General Raoul, and the State of Illinois are all proper defendants. First, Illinois law confers on the Attorney General broad authority to "institute and prosecute *all* actions and proceedings in favor of or for the use of the State, which may be necessary in the execution of the duties of any State officer." 15 ILCS 205/4 (2010) (emphasis added); *see Ball*, 245 F. Supp. 3d at 1017 (observing Illinois Attorney General's "broad authority" under 15 ILCS 205/4). And under the Illinois Bivens Act, "[*a*]*ny person* may bring a civil action against any person who, while conducting civil immigration enforcement, knowingly engages in conduct that violates the Illinois Constitution or the United States Constitution." 740 ILCS 16/5-10 (emphasis added). Although, Illinois claims that its Bivens Act "simply creates a cause of action . . . to private parties who have been injured[,]" Mot. at 8, the plain statutory text more broadly authorizes "any person"—presumably including state officials—to bring such actions. 740 ILCS 16/5-10. Thus, the Act's facial authorization of the Illinois Attorney General to initiate suits suffices to establish standing. *See Ball*, 245 F. Supp. 3d at 1017 (holding that absence of an express enforcement provision did not preclude suit against Illinois Attorney General, given her broad statutory authority to prosecute actions in the State's interest).

Moreover, the Illinois Attorney General has previously asserted the authority to bring claims as *parens patriae*, and nothing in the Bivens Act's statutory text prevents him from initiating Bivens Act suits in that capacity. *See Illinois v. City of Chicago*, No. 17-CV-6260, 2018 WL 3920816, at *2 (N.D. Ill. Aug. 16, 2018) ("The State alleges that it is authorized to bring suit on behalf of the People of Illinois based on the doctrine of *parens patriae* and the Illinois Human Rights Act . . . to defend its 'quasi-sovereign interest in the prevention of present and future harm to its residents, including individuals who are, have been, or would be victims of the City's

7

unconstitutional law enforcement practices.'") (citations omitted)); *see also LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011) ("A state will have standing to sue as *parens patriae* where it can 'articulate an interest apart from the interests of particular private parties' and 'express a quasi-sovereign interest.'" (citation omitted)). Indeed, Illinois lawmakers have expressed precisely this sort of quasi-sovereign interest in passing these Acts. *See* Press Release, Office of the Governor JB Pritzker, Gov. Pritzker Signs Bill to Protect Immigrants from Unjust Federal Actions (Dec. 9, 2025) ("Gov. Pritzker Press Release"), https://perma.cc/JMQ2-GQ4H ("As aggressive immigration enforcement continues to spread, Illinois will stand as a pillar of accountability and justice. . . . In Illinois, we will continue to protect each of our residents, regardless of immigration status.").

For similar reasons, the State of Illinois is also a proper defendant to enjoin. Here, this Court is asked to enjoin the State of Illinois, its agents, officers, and employees, and all other persons and entities in active concert or participation with them, from taking any measures to enforce the Illinois Bivens Act. The Supreme Court has long recognized that "[t]he Federal Government can bring suit in federal court against a State" to "ensur[e] the State['s] compliance with federal law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71 n.14 (1996) (citing *United States v. Texas*, 143 U.S. 621, 644–45 (1892)). And in cases where States are defendants, it is not unusual for a court to enjoin the State and leave it to the State to determine what actions should be taken by which state officers and agencies to achieve compliance. *See, e.g.*, *Pennsylvania v. West Virginia*, 262 U.S. 623, 624 (1923) (per curiam) (ordering "[t]hat the defendant state, and her several officers, agents and servants, are hereby severally enjoined from enforcing, or [attempting] to enforce" an unconstitutional law). The ability of the United States to enjoin a state and all of its officers distinguishes this suit from *Whole Women's Health*, as the private parties there were unable to sue the State itself. Indeed, the district court in United States' challenge to S.B. 8 ruled that the Federal Government had satisfied causation and redressability as to Texas and its officers

8

because "[t]he State merely asserting that it is absolved of any enforcement liability does not mean that it did not cause a constitutional injury." *United States v. Texas*, 566 F. Supp. 3d 605, 643 (W.D. Tex. 2021).

Moreover, the United States here seeks a declaration against Illinois that its law is unconstitutional. Such a declaration itself can provide redress. *See Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 831 (9th Cir. 2025) (declaration provides "relief by binding the State in any subsequent lawsuits seeking compensation for unconstitutional takings under the challenged provision"); *Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003) (declaration that government acted illegally redresses reputational injury). Because the requested declaration would have preclusive effect in any suit brought by Illinois and should inform the decisions of state judges, redressability is satisfied as to Illinois.

Finally, Governor Pritzker is a proper defendant for redressability purposes because his own public statements and actions reflect that he has directed the State government to implement the Bivens Act consistent with his policy prescriptions. Indeed, in signing that Act into law, Governor Pritzker remarked, "[w]ith my signature today, we are protecting people and institutions that belong here in Illinois. . . . Illinois—in the face of cruelty and intimidation—has chosen solidarity and support. . . . [T]he best of us are standing up to the worst of them." Gov. Pritzker Press Release.   Illinois acknowledges that its state constitution provides that "the Governor has the supreme executive power and is responsible for the faithful execution of the laws." Mot. at 7-8 (quoting Ill. Const. art. V, § 8).  Accordingly, Governor Pritzker is a proper named defendant.

For these reasons, the United States has Article III standing to challenge the Illinois Bivens Act as to all named Defendants.[1]

---

[1] In a footnote, Illinois claims the United States lacks a cause of action, but the argument appears to collapse with its standing arguments and thus fails for the same reasons. Mot. at 10 n.2. In any event, the United States clearly has an implied equitable cause of action to sue a State under

**2.** **The United States Has Standing To Challenge the CASPA as State Judges Issuing Orders Preventing Courthouse Arrests Are Sufficiently Adverse to the Federal Government**

For all of the foregoing reasons, the United States has standing to challenge the CASPA, because it similarly regulates the Federal Government, exposes federal agents to civil liability, and obstructs enforcement of immigration laws. *See United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024). More specifically, as alleged in the Complaint, Illinois' laws "have left courthouses as one of the few predictable locations where [immigration officers] can find criminal aliens and safely take them into custody." Compl. ¶ 72. Consequently, "Illinois' restrictions on civil arrests impede federal law enforcement and jeopardize public safety" by turning state courthouses into sanctuary zones. *Id*. ¶ 70. And if officers arrest someone—including anyone capaciously defined as a "court companion" on public sidewalks 1,000 feet away from the courthouse—in violation of the CASPA or the judicial orders it authorizes, federal officers risk liability for "civil damages for false imprisonment, including actual damages and statutory damages of $10,000." *Id*. ¶ 78 (citing 705 ILCS 96/10-25(a)). Moreover, like the Illinois Bivens Act, the CASPA harms the Federal Government by redirecting resources to defend against CASPA actions. These injuries are clearly traceable to the CASPA because, in its absence, immigration officers would otherwise be free to conduct arrests near or around courthouses safely and without risking exposure to civil liability under state law. *See United States v. Illinois*, 796 F. Supp. 3d 494, 510 (N.D. Ill. 2025). Enjoining the CASPA and declaring it unlawful would provide tangible relief by removing Illinois' impediments to federal immigration enforcement. *See id.*

This Court should reject Illinois' arguments that the United States lacks standing to challenge the CASPA based on its contention that Illinois judges who issue orders preventing courthouse arrests are not sufficiently adverse to the United States. The CASPA confers on state

the Supremacy Clause. *See*, *e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016).

judges broad discretion to issue orders preventing "civil arrests," as defined under 705 ILCS 96/10-10, for anyone capaciously defined as a "[c]ourt companion," *id.*, in or around a courthouse, including, *inter alia*, "any public way within 1,000 feet of the courthouse . . ." *Id.* at 96/10-15(a)(5). As with its arguments regarding its Bivens Act, Illinois takes an expansive view of the Supreme Court's decision in *Whole Woman's Health*, which observed that the law "does not normally permit federal courts to issue injunctions against state-court judges or clerks" because "[u]sually, those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties." 595 U.S. at 39.

But, as the Eighth Circuit has recognized, that is not an absolute rule, as members of a state judiciary are not immune from suit when they act like executive officials through the performance of their administrative functions. *See Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 913 (8th Cir. 2022). Indeed, these "judicial orders" under the CASPA lack all the "adjudicatory" hallmarks that the Eighth Circuit found to be dispositive. For one thing, the CASPA provides no means for the United States to appeal such a "judicial order." *See id.* at 912 ("Missouri's implementation of its e-filing system is not the type of decision that gets appealed, at least not in the usual way."). Moreover, there is sufficient adverseness because the United States complains that these "judicial orders," issued by state judges, hinder federal agents in performing immigration enforcement functions near and/or around state courthouses by exposing them to civil liability. *Id.* at 913. In other words, the United States is seeking an injunction of the State of Illinois' enforcement of the CASPA by enjoining judges from issuing the CASPA-authorized orders preventing civil arrests at courthouses, not "restrain[ing] a court from acting in any case brought before it[.]" *Ex parte Young*, 209 U.S. 123, 180 (1908).

Thus, the CASPA extends beyond enabling courts to "resolve disputes between parties." *See Whole Woman's Health*, 595 U.S. at 39. Unlike *Whole Woman's Health* where the clerks and judges were simply adjudicating disputes between two private parties, here the judges can issue

11

general orders directly regulating federal officers even when those officers have no relation to an underlying case being adjudicated. *See Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 11 (1st Cir. 2000). That is acting adverse to the United States, not as a neutral arbiter of a case. Indeed, the Supreme Court contrasted the suit in *Whole Woman's Health* regarding merely "processing the case" from the situation here challenging a judge's general order. *Whole Woman's Health*, 595 U.S. at 42 (citing *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) (no judicial immunity to challenge pretrial detention practice by judge)). Such suits are common and have not lacked standing. *See Stern*, 214 F.3d at 11 (permitting U.S. challenge to local rule by suing district court); *Russell v. Hug*, 275 F.3d 812, 816-23 (9th Cir. 2002) (similar); *Sup. Ct. of N.M.*, 839 F.3d at 906 n.9 (allowing injunction against state court of professional rule). The CASPA uses the courts as instruments to regulate the United States, interfering with its sovereign prerogatives and impeding immigration enforcement. Illinois cannot grant its judges the authority to directly regulate federal officers and then hide behind the fact that they otherwise perform judicial functions. The orders CASPA authorizes are not traditional judicial functions.

Regardless, Governor Pritzker, Attorney General Raoul, and the State of Illinois are still the proper defendants. Like the Illinois Bivens Act, nothing on the face of the CASPA's statutory text displaces any other state enforcement authority or otherwise confines enforcement solely through private suits, *see* 705 ILCS 96.10-25—in stark contrast with S.B. 8, *see Whole Woman's Health*, 595 U.S. at 35-36. For instance, the CASPA facially permits the Illinois Attorney General to bring suit on behalf of the State against a federal officer who violates the CASPA. *See* 15 ILCS 205/4; 705 ILCS 96.10-25; *see also Ball*, 245 F. Supp. 3d at 1017. As for Governor Pritzker, his office issued a press release decrying "[t]he Trump administration's aggressive courthouse sweeps . . ." Gov. Pritzker Press Release (citation omitted). These promotional statements of the CASPA reflect his willingness to use his authorities as Governor to enforce them. Accordingly, the three

12

named Defendants are proper and the requested declaratory and injunction relief against them would provide meaningful redress.

### B.       The United States Plausibly Alleges Pre-Enforcement Standing

This Court should reject Illinois' passing suggestion that the Federal Government has not shown pre-enforcement standing to challenge the Illinois Bivens Act. Mot at 6 (citing *Whole Woman's Health*).[2] "It is well-established that 'pre-enforcement challenges . . . are within Article III.'" *Ezell v. City of Chicago*, 651 F.3d 684, 695-96 (7th Cir. 2011). A plaintiff need not violate a law and risk enforcement in order to challenge it. *See Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). In a pre-enforcement action, a plaintiff satisfies the injury-in-fact requirement of Article III standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that the plaintiff is under "a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted); *see ACLU v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012). The very "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010).

Here, the United States has plausibly alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest" but proscribed by the challenged laws. *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).[3] As alleged in the Complaint, under the Illinois

---

[2] *Whole Woman's Health* involved a state-created private cause of action against individuals who perform or assist prohibited abortions; that case, unlike the challenge here, did not involve direct regulation of the Federal Government. Compl. ¶¶ 50-63. Illinois contends the United States must await litigation against federal officers before the Federal Government "may renew its arguments about intergovernmental immunity." Mot. at 10. That result would allow any state to skirt pre-enforcement challenges on Supremacy Clause grounds by regulating the Federal Government through private causes of action forcing the United States to defend against the state law on a case-by-case basis. That is not what *Whole Woman's Health* holds, and further, it is an afront to the Supremacy Clause.

[3] The mere regulation of the Federal Government by a law creates "sovereign injuries" that suffice for a pre-enforcement challenge. *Arizona v. Yellen*, 34 F.4th 841, 852-53 (9th Cir. 2022); *see also*

Bivens Act, "[n]ot only are federal officers potentially subject to arduous proceedings and actual damages, they could face punitive damages for particular conduct not otherwise illegal under federal law." Compl. ¶ 59. For example, "the Act's codified factors for determining 'the reprehensibility of the defendant's conduct' disproportionately apply to federal law enforcement[] officials or their necessary protective measures (e.g., whether the officer wore a facial covering, whether the officers failed to identify themselves as law enforcement, and whether the officer was operating a vehicle without an Illinois license plate)." *Id*. ¶ 65. Notwithstanding such exposure to punitive damages, *id*. ¶ 60 (citing Section 5-15(a)(1)-(6)), the United States has alleged that "[g]iven the rise in personal threats and violence that federal agents face, as well as the necessity for undercover operations, federal law enforcement agencies permit their officers to choose whether to wear facial coverings to protect their identity." *Id*. ¶ 66. Accordingly, there can be no serious dispute that the United States intends to engage in conduct "arguably proscribed" by the Illinois Bivens Act.

As also sufficiently pled, the threat of enforcement is substantial. *See* Compl. ¶¶ 19, 20, 53. The Illinois Bivens Act permits "*any person*" to bring these civil actions against a federal agent "conducting civil immigration enforcement." 740 ILCS 16/5-10(a) (emphasis added). "The very existence of a statute implies a threat to [enforce]," such that the allegation of harm is not speculative. *Ezell*, 651 F.3d at 695-96 (cleaned up). Indeed, Governor Pritzker has made it no secret that the purpose of these laws is to "enshrine[] protections" from "aggressive civil immigration enforcement actions" by, *inter alia*, "Holding Federal Immigration Enforcement Accountable." Gov. Pritzker Press Release; *see also* Compl. ¶ 54 n.5.  Thus, contrary to Illinois' contentions, the United States has satisfied the requirements for pre-enforcement standing.

---

*In re Debs*, 158 U.S. 564, 586 (1895); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). As the Supreme Court stated "[i]t is beyond doubt" that a complaint "asserts an injury to the DWD" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. United States ex. rel. Stevens*, 529 U.S. 765, 771 (2000). That injury is also traceable to Defendants and would be redressed.

14

The United States therefore has standing to seek review of the challenged laws.

II.   **The Complaint Sufficiently Pled Claims of Unlawful Regulation and Discrimination**

A.   **Illinois Does Not Contest that the Illinois Bivens Act Unlawfully Regulates and Discriminates Against the United States**

Illinois does not assert any 12(b)(6) arguments regarding the Illinois Bivens Act, and Illinois cannot raise those arguments for the first time in a reply. *See Williams v. IDOC*, No. 3:19-cv-739-MAB, 2021 WL 1379483, at *2 (April 12, 2021) (collecting Seventh Circuit caselaw); *see also Shifrin v. Associated Banc Corp*, No. 3:12-cv-00839-JPG-DGW, 2013 WL 1192766, at *5 (S.D. Ill. Mar. 22, 2013) ("Arguments raised for the first time in a reply brief are waived.") (quoting *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998))). Nor could Illinois make any such arguments. The Complaint plausibly alleges in Count I that the Illinois Bivens Act unlawfully regulates the Federal Government by, among other things, directly subjecting federal officers to arduous court proceedings and punitive damages. *See* Compl. ¶¶ 80-87. In Count II, the Complaint plausibly alleges the Illinois Bivens Act unlawfully discriminates against the Federal Government by expressly subjecting officers who conduct "civil immigration enforcement" for disfavored treatment. *See id*. ¶¶ 88-93. Because Illinois did not challenge the merits of the Bivens Act claims, which in any event are sufficiently pled, Count II and Count I as to the Bivens Act must proceed.

B.   **The United States Sufficiently Pled a Claim of Unlawful Regulation as to the CASPA**

Any regulation of the Federal Government by a State—whether or not coextensive with a federal requirement or minimally burdensome—is prohibited. *See United States v. California*, No. 26-926, 2026 WL 1088674, at *5 (9th Cir. Apr. 22, 2026). The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested

15

in the general government." *M'Culloch*, 17 U.S. (4 Wheat.) at 436. And Congress, in the INA, conferred upon the Federal Government exclusive authority over immigration, and "broad, undoubted power" to conduct immigration enforcement activities without constraint of competing common-law privileges. *See Arizona*, 567 U.S. at 394; *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231; Compl. ¶¶ 25-26. Yet the CASPA impermissibly regulates those functions. The United States sufficiently alleged that the CASPA directly regulates the conduct of the Federal Government "by dictating where federal agents may conduct civil arrests not only on courthouse grounds but anywhere within 1,000 feet of the courthouse." Compl. ¶ 68; *see also id*. ¶¶ 69-73.

### C.      Federal Law Does Not Incorporate a Privilege Against Courthouse Arrests

The CASPA plainly purports to control the Federal Government's immigration enforcement activities, and no common law privilege—whatever its scope—can justify the CASPA's unlawful regulation. Illinois' central argument to the contrary rests on the erroneous contention that "federal law does not authorize courthouse immigration arrests" because it maintains a "common law privilege" against courthouse arrests, Mot. at 15, and consequently the CASPA's "parallel prohibition under state law does not alter the federal government's operations in any material way[.]"[4] Mot. at 19. Illinois is wrong.

First, even if the so-called common law privilege was incorporated or left undisturbed by federal law, that does not mean each State can further regulate federal officers and subject them to a variety of penalties of the State's choosing. *See United States v. City of Arcata*, 629 F.3d 986, 991–92 (9th Cir. 2010) ("[a] state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal

---

[4] In support of its argument that the CASPA cannot "regulate the federal government by preventing it from doing something that it has no authority to do in the first place," Mot. at 19, Illinois puts forth an especially unavailing hypothetical: likening the United States' broad authority over conducting immigration operations to that of unlawful trespass. *See Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 208 (5th Cir. 2024) (where the court enjoined the Federal Government from damaging, destroying, or interfering with Texas's c-wire fence on its border with Mexico). The distinctions between the two situations are self-evident. *Id*.

law."). The remedy for any violations of federal law comes from federal law, that does not permit States to supplement federal limits on federal officers anyway they see fit just because it might not be burdensome. Indeed, the Ninth Circuit rejected a nearly identical argument, as any regulation on federal law enforcement "is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 2026 WL 1088674, at *5.

Second, in any event, the INA does not incorporate the so-called common law privilege. Quite the opposite. Congress granted the Federal Government the authority (and sometimes the mandatory duty) to arrest certain aliens without any geographical limit. *See* 8 U.S.C. §§ 1225(b)(2), 1226. Similarly, once an alien has been adjudged removable, he generally must be removed within 90 days and is subject to mandatory detention-either "[d]uring the removal period" or, in certain circumstances, beyond. 8 U.S.C. § 1231(a)(2). Congress also gave the Federal Government the authority to make warrantless arrests but excluded such authority for "dwellings." 8 U.S.C. § 1357(a) (2)-(3). Despite knowing how to impose geographical limits, Congress did not limit this authority at courthouses. Illinois' contention that the privilege is incorporated is further belied by a 2006 amendment to the INA. That amendment added 8 U.S.C. § 1229(e), which discusses "cases where an enforcement action leading to a removal proceeding was taken against an alien at . . . a courthouse (or in connection with that appearance of the alien at a courthouse)." *See* 8 U.S.C. § 1229(e)(1)-(2)(B). This provision "suggests that Congress did anticipate at least some arrests occurring at courthouses." *See New York v. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019).[5] A district court recently analyzed the application of the 2006 INA amendment. *See Afr. Communities Together v. Lyons,* 799 F. Supp. 3d 362, 389–90 (S.D.N.Y. 2025). In *Lyons*, the court held that the "2006 adoption of section 1229(e) was not a Congressional

---

[5] While Illinois argues that the addition of Section 1229(e) is limited to criminal arrests, Mot. at 18, this argument is refuted by the arguments herein, including the inability to neatly divide immigration arrests into "criminal" and "civil" categories, *see infra*.

abrogation of the incorporated privilege, but an acknowledgement that no such privilege was ever incorporated into the statute." *Id*. at 392.

Third, the only circuit court to address whether the privilege applies to civil immigration arrests held it did not.[6] In *Ryan v. Immigr. & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020), the court concluded that the privilege has never been thought to protect against criminal arrests or other forms of criminal processes in courthouses and analogized civil immigration arrests to criminal arrests. As the court explained, "[j]ust as criminal arrests implicate the uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil immigration arrests seek to vindicate similar kinds of interests in controlling immigration and the presence of noncitizens in the country." *Id*. at 27. Accordingly, the court held that "just as the common law privilege was not applied to criminal arrests because of these overriding sovereign interests, one would think (for the same reason) that the privilege would not shield civil immigration arrests." *Id*. Here, the Court should find the same. The CASPA is predicated on the misconception that immigration-related arrests can be neatly divided into "civil" and "criminal" categories when the vast majority of removal cases involve aspects of administrative, civil, and criminal charges. *Id*. ¶¶ 46-48. The Complaint alleges that legitimate civil law enforcement activities near courthouse grounds may involve threats to national security or risks of violence and physical harm. Compl. ¶ 70. Conducting these arrests at or near courthouses often reduces risks to public safety. *Id.; see also* Memorandum from Acting Director of Immigration and Customs Enforcement Todd M. Lyons, Civil Immigration Enforcement Actions in or Near Courthouses (May 27, 2025). Because "[c]ivil immigration arrests are initiated by the sovereign in order to vindicate uniquely sovereign interests," *Ryan*, 974 F.3d at 26, including controlling immigration and protecting public safety,

---

[6] Although the United States recognizes that some district courts have concluded that the INA incorporates a courthouse arrest privilege, *see* Mot. at 15 (citing cases), the analyses in these non-binding cases are unpersuasive.

the CASPA, even if coextensive with any common law privilege, cannot unlawfully regulate the Federal Government.

Finally, the CASPA's unlawful regulation of the Federal Government reaches far beyond the bounds of any privilege. In contrast to the CASPA's broad privilege, history reflects a *narrow* common-law immunity from civil arrests for "suitors, as well as witnesses, coming from another State or jurisdiction . . . while in attendance upon court, and during a reasonable time in coming and going" to facilitate personal jurisdiction over a defendant. [7] *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916); *see also Ryan*, 974 F.3d at 21-22 (discussing origins of the privilege). The CASPA defines "court companion[s]" to encompass an especially broad class of persons, including those "whose purpose is to support, assist, or accompany a person who is going to, remaining at, or returning from a court proceeding." *See* 705 ILCS 96/10-10; Compl. ¶¶ 69, 86. Thus, persons merely "transporting a party, witness, or potential witness to or from the court proceeding" (e.g., rideshare or tax drivers) can evade arrest because of the CASPA. *Id*; Compl. ¶ 69. Such reach is far beyond the common-law privilege limiting arrests of "suitors, as well as witnesses[.]" *Stewart*, 242 U.S. at 129. The CASPA also directly regulates the Federal Government's ability to conduct immigration enforcement activities by prohibiting federal officers from making civil arrests not only on courthouse grounds, but on any "public way within 1,000 feet of the courthouse including a sidewalk, parkway, or street." 705 ILCS 96/10-15; Compl. ¶¶ 68, 85. In urban areas, the 1,000 foot "buffer zone" around Illinois state courthouses could conceivably cover multiple city blocks. Thus, the Complaint sufficiently demonstrates that the CASPA reaches far beyond the bounds of any common law privilege in direct contravention of the Supremacy Clause.

---

[7] Caselaw shows that any common-law immunity from civil arrests was an extension of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical presence. *See Daimler AG v. Bauman*, 571 U.S. 117, 125-26 (2014). As courts no longer need a defendant's physical presence to obtain personal jurisdiction, *see, e.g.*, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), the primary rationale for the common-law privilege—to protect those who were otherwise not subject to a state's jurisdiction but for their physical appearance in that state's court—has disappeared, and thus the privilege carries little force.

**D.    Illinois' Alternative Proprietor Argument is Unavailing**

Illinois' "one final" argument as to why the CASPA "does not unconstitutionally regulate the federal government" is equally unavailing. Mot. at 20. Illinois argues that the State of Illinois is acting as a "proprietor, not a regulator." *Id.* (citation omitted); *United States v. New York*, 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025), *appeal filed*, No. 26-104 (2d Cir. Jan 16, 2026) (quoting *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024)). However, as the Supreme Court has recognized, no state interest—proprietary or otherwise—can justify state laws that regulate the Federal Government. Indeed, the bar on state regulation of federal activities permits "[n]o other adjustment of competing enactments or legal principles." *Mayo*, 319 U.S. at 447 (holding that a state could not require the Federal Government to pay an inspection fee for fertilizer on grounds that "the federal function must be left free" despite the state's interest in "protect[ing] consumers from fraud."); *see also Arizona v. California* 283 U.S. 423, 451-52 (1931) (concluding that intergovernmental immunity principles barred a state from subjecting a federal dam construction project to a state approval process, rejecting the state's invocation of its "quasi sovereign rights."). This argument, like Illinois' other arguments, fails.

## CONCLUSION

For the foregoing reasons, Illinois' Motion to Dismiss should be denied.

Dated: April 24, 2026

STEVEN D. WEINHOEFT
*United States Attorney*

United States Attorney's Office
Southern District of Illinois
9 Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*

ALEXANDER K. HAAS
*Director*

JACQUELINE COLEMAN SNEAD
*Assistant Director*

 *s/ James J. Wen*
JAMES J. WEN
(NY BAR NO. 5422126)
JACQUELINE LAU
(D.C. BAR NO. 90024952)
  *Trial Attorneys*
  United States Department of Justice
  Civil Division
  Federal Programs Branch
  1100 L Street NW
  Washington, DC 20005
  (202) 616-8185
  James.J.Wen@usdoj.gov

*Attorneys for the United States*